UNITED STATES of America,
Plaintiff–Appellee,

v.

Ronald B. EVANS, Defendant–Appellant.

No. 93–2940.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1994.

Decided June 17, 1994.

---

Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Office of the U.S. Atty., Dyer, IN, for plaintiff-appellee.

Arlington J. Foley (argued), Merrillville, IN, for defendant-appellant.

Before WOOD, Jr., COFFEY, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Ronald B. Evans appeals his conviction for five counts of a six-count indictment returned against him for allegedly operating an automobile chop shop out of his father's garage in Hebron, Indiana. Count 1 charged Evans with operating, maintaining, and controlling a chop shop in violation of 18 U.S.C. § 2322. Counts 2 and 3 charged Evans with receiving, possessing, concealing, and storing a motor vehicle that had crossed the state line after being stolen, in violation of 18 U.S.C. §§ 2313 and 2. Count 4 alleged that Evans possessed a 1991 GMC Jimmy with intent to sell it knowing that the Vehicle Identification Number ("VIN") had been unlawfully altered in violation of 18 U.S.C. §§ 2321 and 2. Count 5 charged Evans with knowingly and unlawfully altering the VIN of the 1991 GMC Jimmy, in violation of 18 U.S.C. §§ 511 and 2. Count 6 charged Evans with making false statements with the intent to influence a federally insured bank to issue a loan in violation of 18 U.S.C. § 1014.

Before trial Evans moved to suppress the evidence seized by the government and statements made after a warrantless search on the property where his car repair business was located. The district court denied the motion to suppress, finding that Evans' father had consented to the search of the property. At the close of the government's case, the trial court granted Evans' motion for a judgment of acquittal on Count 1. A jury found Evans guilty on the remaining five counts.

At Evans' sentencing hearing, the district court denied the defendant's request for a two-point reduction of his base offense level under § 3E1.1 of the Sentencing Guidelines ("Guidelines" or "U.S.S.G.") for acceptance of responsibility. The court sentenced Evans to thirty-three months imprisonment, imposed a $6,000 fine, and ordered restitution in the amount of $7,498.98. Evans appeals his conviction and sentence. We affirm.

## I. BACKGROUND

### A. The Hearing on the Motion To Suppress

Two confidential informants told FBI Agent David Roth that Chris Mauger was involved in the theft of vehicles, particularly late model Chevrolet Blazers and pickup trucks. The informants stated that Mauger and his confederates would steal a dealer's license plate from a car dealer's lot, go to another dealer to test drive a vehicle, and duplicate the car key. The thieves would later return and steal the vehicle they had taken on the test drive, and place the stolen dealer's plate on the stolen car. Based upon this information, the FBI decided to conduct an investigation of Mauger and his associates. During their surveillance of Mauger and his associates, the FBI observed them stealing vehicles and attaching dealer plates to stolen vehicles.

While surveilling Mauger's residence at 2400 Ralston Street in Gary, Indiana, on December 10, 1992, FBI agents noted that a new green and tan, four-door Chevrolet Blazer truck bearing an Illinois dealer license plate was parked in the driveway. The agents checked the National Crime Information Center ("NCIC") which informed them that, according to the Illinois Secretary of State, the license plate was registered to Currie Motors in Chicago, Illinois. An agent telephoned James Pop, Currie Motor's general manager, who revealed that someone had stolen the license plate from the dealership in March 1992. Pop also informed the agent that Currie Motors was a Lincoln Mercury dealership and therefore did not sell Chevrolet Blazers.

The Blazer remained parked in Mauger's driveway until 5:20 p.m., when the agents observed an individual later identified as Mark Kertis, one of Mauger's criminal associates, drive off in the truck. The two confidential informants also had informed the agents that for many years Mauger had been delivering the stolen vehicles to what they referred to as an unknown disposal location. In an attempt to learn the location of the disposal location and the identity of the person receiving the stolen vehicles, the agents followed the Blazer as it proceeded down the highway until it arrived at 925 State Road 2 in Hebron, Indiana. The Blazer pulled into the driveway for that address and entered a large garage through one of two overhead doors. The door immediately closed.

Ten FBI agents drove up the driveway and exited their vehicles. Agent Roth approached the garage, which had two overhead garage doors and two entrance doors, and knocked on the left entrance door. Moments later, Evans exited from the right entrance door. The agents identified themselves to Evans, and placed him under arrest for receiving a stolen vehicle. The justification for Evans' arrest, as reflected in the eventual charges in the indictment, increased as a result of evidence gained during a search of the premises. Mark Kertis, the person who had delivered the Blazer, followed Evans as he exited the garage and the agents arrested him as well. Several agents conducted a protective sweep of the garage, checking for the presence of others involved in the criminal operation. The agents had their guns drawn when they approached the garage, but they holstered their weapons after Evans and Kertis were arrested and the protective sweep was completed. Evans was advised of his *Miranda* rights and signed a form indicating he understood his rights.

As the agents approached the garage, Agent William Warner noticed someone standing in the window of the house on the property, which was located approximately 130 feet from the garage. Warner testified that he observed the person holding either "a rifle or possibly the fold of a curtain" beside him, and that he believed it prudent to investigate. With his gun drawn but pointing down at his side, Warner went to the front door of the house where he was met by Glenn Evans ("Glenn"), the defendant's father. From the threshold of the door, Warner identified himself and requested that everyone in the house remain in the foyer area inside the door until the arrests were completed. Glenn lived in the house with his wife, their daughter, his son-in-law, and two grandchildren. When everyone was in the foyer, Warner holstered his weapon. Warner and Glenn raised their voices and Glenn accused the agents of intimidating his family. Warner loudly explained that the agents were in the midst of arresting suspects near the garage. Warner added that the occupants of the house should remain in the foyer

of the house for everyone's safety while the agents completed the arrests at the garage.

Glenn ignored Warner's admonition to remain in the house and stated that because he was on his property he would go where he pleased. Glenn eventually walked over to the garage with his son-in-law to speak to Agent Roth. Glenn identified himself to Agent Roth as the defendant's father and the owner and occupant of the residence and the garage. In response to the agent's questions, Glenn stated that his son operated a business out of the garage. He also related that his son did not lease the property and paid neither rent nor utility bills. Agent Roth testified that Glenn informed him that he had keys to the entrance doors of both garage bays, but that he had lost the key to the entrance door to the right bay. Nevertheless, Glenn told Roth that there was an unlocked door inside the garage between the two bays that allowed Glenn to travel freely from the left bay to the right bay where the defendant's business was located.

Roth testified at the suppression hearing that Agent May produced a search consent form and informed Glenn that the agents could not search without a warrant and that Glenn had the right to refuse to consent. The agents allowed Evans to speak to his father at this point. The agents overheard Glenn ask his son whether stolen vehicles were on the property, and Evans responded that obviously the automobiles were stolen, or the FBI would not be on the premises. Glenn and Evans were overheard discussing whether Glenn should consent to search, and with Evans' agreement, Glenn signed the consent form authorizing a search of the entire premises. The agents proceeded to search the garage and adjacent areas. Evans repeatedly told the agents that he wished to cooperate, and he stated that there were at least seven stolen vehicles on the premises. After Glenn had signed the consent form, neither Evans nor Glenn objected to any aspect of the search.

At the suppression hearing Glenn refuted the agents' testimony in several respects. According to Glenn, the initial encounter with the FBI at the house was more threatening than Agent Warner's description. Glenn

stated that the agent refused to tell him what was happening despite his repeated inquiries, and that he ordered everyone out of the house. According to Glenn, the argument between he and the agent and Glenn died down when three other agents appeared and took the obstreperous agent aside.

After about ten or fifteen minutes had passed, Glenn stated he went to the garage where an agent met him and asked if he would sign a consent form so the agents could conduct a search.[1] The agent allegedly told him that if he signed the consent form the agents would not search his house and that "it would go an awful lot easier on [Evans]"; if he refused to consent, according to Glenn, the agent stated that the FBI would obtain a search warrant and search his house as well as other areas of his premises. Glenn testified that he could not read the form because of the failing light and his weak eyes, and that he asked the agent to explain the form's content. According to Glenn, the agent simply said the form would dispense with the need for a search warrant and allow the agents to look at two other cars. Glenn also refuted the agents' testimony that he had consulted with his son before signing the consent form; Glenn testified that he did not speak to his son until *after* he signed the consent form. Glenn testified that he would not have signed the consent form if he had been aware of its contents, which authorized a search of the entire premises, although he admitted that he did not ask either the agent or his son-in-law to read the form to him.

Glenn's son-in-law contradicted Glenn's testimony and stated that Glenn did request that the son-in-law and the agent try to read the form. The son-in-law claimed that neither he nor the agent could read the form because it was so dark. While the scope of the search purportedly exceeded Glenn's understanding of his consent, Glenn stated that he never complained about the nature of the search during the search because he presumed his written consent justified the agents' actions.

Glenn testified that he did not have a key to the overhead door or the entrance door to the right bay and that the interior door between the bays could be locked. Nonetheless, Glenn conceded that although he had no keys to the interior door when it was locked, if he "need[ed] to go in there, [he] probably could." Glenn volunteered that he did not need to consult with his son to consent to a search of the entire building. His son Ron, the defendant, worked in his shop in the garage's right bay by himself, according to his father.

After the evidentiary hearing, the district court denied the defendant's motion to suppress and ruled that the FBI had probable cause to arrest Evans, that Glenn had actual and apparent authority to consent to a search of the garage and surrounding structures, and that Glenn's consent was voluntary.

### B. Evans' Trial

At trial, the government presented evidence establishing the same facts concerning the surveillance of Mauger, the arrests of Evans and Kertis, and the fruits of the search conducted on Glenn's property that had been established at the suppression hearing. The government presented additional evidence at trial establishing the extensive nature of Evans' stolen car operation as well as his illegal financing arrangement for the stolen vehicles. The government also introduced evidence of each of the stolen vehicles found on Glenn's premises and materials used to retag stolen cars with new VIN's and phony inspection affidavits used to obtain titles for rebuilt vehicles.

---

1. The consent for that Glenn eventually signed stated:

I, *Glenn Evans,* having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize ... Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to conduct a complete search of my premises located at *925 S. St. Rd. 2–Hebron.* These agents are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.

This written permission is being given by me to the above-named Special Agents voluntarily and without threats or promises of any kind.

Evans had purchased a salvage 1990 GMC Jimmy[2] with VIN 1GKCT18Z5L8507841 for $1,035 from Tech–Cor, Inc. in Markham, Illinois, on October 2, 1991, according to the testimony of its reclamation manager. Tech–Cor auctions vehicles that insurance companies have declared to be total losses. The insurance company then provides salvage titles for the vehicles so that they may be sold. The vast majority of the vehicles with salvage titles are used only for spare parts. For an auto rebuilder who purchased a salvage title vehicle to get a rebuilt title for the vehicle, he must submit an affidavit of parts used to rebuild the vehicle and have a local law enforcement officer inspect the vehicle. Tech–Cor's reclamation manager also testified that Evans purchased two salvage 1992 Chevy Blazers. He paid $3,450 for one of the Blazers.

The search the agents conducted after Glenn signed the consent to search form yielded eight stolen vehicles and a number of salvage vehicles. The government presented evidence at trial establishing that Evans' practice was to remove the public VIN tag located on a salvage vehicle's dashboard and then replace the VIN on the stolen vehicles with the salvage vehicle's VIN tag. By re-tagging the stolen vehicle with the salvage vehicle's VIN tag, Evans was able to pass off the stolen vehicle as a rebuilt salvage vehicle. The final step in the process was to obtain a title for a rebuilt vehicle, which would enable the titleholder to license the previously destroyed vehicle as a roadworthy automobile.

Agent Roth testified that an auto rebuilder seeking to obtain a rebuilt title for a vehicle with a salvage title has to submit documentation of the parts used to restore the vehicle and have a law enforcement officer inspect the vehicle.[3] The rebuilder must prepare his affidavit of restoration bearing his and the officer's signatures indicating the origin of the major parts used in restoring the vehicle. After the officer inspects the vehicle, he signs his name to the rebuilder's affidavit of restoration. The rebuilder then must send the affidavit and the salvage title to the Indiana Bureau of Motor Vehicles ("BMV") and the BMV will return a rebuilt vehicle title in the individual's name. During their search of the garage, the agents found copies of blank affidavits of restoration bearing what appeared to be the signature of an Hebron, Indiana, police officer. The master copy of the affidavit for restoration of a vehicle had paper affixed over the affidavit with the signature of the officer. Agent Roth testified that the blank affidavits could be filled out for any vehicle and used to obtain a rebuilt vehicle title.

Once Evans had a rebuilt vehicle title, he was able to secure loans using the stolen car disguised as a rebuilt vehicle as collateral. Evans, doing business as Ron's Auto, had a $25,000 line of credit at the Hebron, Indiana, branch of the First National Bank of Valparaiso. The bank loaned Evans money for specific vehicles, and the loans were secured by liens on each vehicle's title. Evans would bring a rebuilt vehicle title to the bank and request a loan with the understanding that the vehicle was 90 to 95 percent complete, possibly needing items like a paint job, a touch up, or new glass. Patrick McGinley, branch manager of the bank, testified that he would make loans to Evans within a thousand dollars of the book value of the rebuilt vehicle used as security. On October 8, 1992, Evans sought a loan of $10,000 on a vehicle he stated was a rebuilt 1990 GMC Jimmy. Evans provided McGinley with a copy of his title application. The bank loaned Evans $10,000, relying on Evans' representation that the loan was for a vehicle that was almost completely rebuilt, and received a rebuilt title for a 1990 GMC Jimmy with the VIN 1GKCT18Z5L8507841 from the State of Indiana.

In the middle of November 1993, Jerry Rentschler, a private citizen with no knowledge of Evans' car theft operation, happened to drive past Evans' auto shop and noticed several wrecked Chevrolet Blazers parked around the shop on Glenn's property.

---

**2.** Agent Roth testified that the Chevrolet Blazer and the GMC Jimmy are both General Motors trucks and are very similar in appearance.

**3.** The law enforcement officer's responsibility was to inspect the rebuilt vehicle to insure that the parts documentation was accurate and that the title and registration were proper.

Rentschler asked Evans if he had a Chevrolet Blazer for sale. Evans showed him a GMC Jimmy that Evans said he had purchased from Tech–Cor with a missing front bumper, missing side molding, a broken steering column, and a missing radio. Rentschler agreed to purchase the vehicle for $10,500, including sales tax, and he gave Evans a $500 down payment. When Rentschler paid an additional $8,000 for the vehicle, Evans gave him the title, but kept the vehicle to make the necessary repairs. Rentschler checked the VIN on the vehicle against his title and noted that the numbers matched. Nevertheless, Rentschler subsequently learned that the vehicle, supposedly a 1990 model, had 1991 wheel rims and a decorative stripe that was first available on the 1991 models. The vehicle Rentschler bargained for was the same vehicle Evans used as collateral for the loan from First National Bank of Valparaiso.

On December 10, 1993, FBI agents conducting the surveillance of the residence of Chris Mauger at 2400 Ralston in Gary, Indiana, discovered the Rentschler vehicle and other stolen automobiles when they followed the green and tan 1993 Chevrolet Blazer with the Illinois dealer license plates stolen from Currie Motors to the garage on Glenn Evans' property and conducted a search. As recounted earlier, the agents arrested Evans and Mark Kertis, the driver of the Blazer. The same evidence presented at the suppression hearing concerning the arrests of Evans and Kertis and the search of Glenn's property was admitted at Evans' trial.

During Agent Roth's initial interrogation of Evans, the defendant informed Roth that Kertis had called him offering the Blazer. Later during the same interview, Evans contradicted himself and told Roth that he had called Kertis and ordered the green Blazer. Evans said that he was going to use the parts to rebuild a salvaged Blazer he had purchased. Evans admitted that Mark had brought other stolen vehicles to him on prior occasions but he said he only wanted to talk about the vehicles then on the property.

During the search, the agents found the green and tan Blazer with the stolen dealer license plate they had followed from Mauger's residence on the right side of the garage. The Blazer was a 1993 model with 123 miles on the odometer. The Blazer, with a dealer's invoice price of $24,228, had been stolen from Bill Jacobs Chevrolet in Plainfield, Illinois. Count 2 of the indictment referred to the green and tan 1993 Blazer.

In a shed next to the garage on Glenn Evans' property, agents found the green and tan Blazer salvage hulk that Ron Evans had purchased from Tech–Cor for $3,400. Evans told the agents that he planned to use the salvage Blazer to retag the stolen green and tan Blazer.

The red two-door GMC vehicle that Rentschler had purchased from Evans was parked by a nearby building with a collapsed roof. When Agent Roth asked Evans about the vehicle, he initially told the agent that he was rebuilding it and that there was nothing illicit about it. Later Evans claimed that he was rebuilding it with stolen parts, and he eventually admitted that the vehicle was stolen and retagged. The vehicle was a 1991 GMC Jimmy that had been stolen from James Duncan in Dyer, Indiana, on October 16, 1992, four weeks after Duncan had purchased it for $17,000. It was retagged on the dashboard with public VIN [4] of the 1990 salvage hulk Evans had purchased for $1,035 from Tech–Cor. The agents found the remnants of the 1990 salvage hulk with its public VIN missing and the federal sticker cut out of the door post in the left bay of the garage. The salvage hulk had no axles, no doors, no windows, and a collapsed roof. Moreover, much of the engine was missing. The agents

---

4. Agent Roth testified that the public VIN appearing on an automobile's dashboard next to the windshield has seventeen characters indicating the vehicle's origin, make, body style, and production information. It is referred to as a "public VIN" because it is the only VIN that may be easily checked because of its location on the dashboard. The last eight numbers are commonly referred to as the "derivative VIN." The derivative VIN, so named because it contains only a portion of the information revealed in the public VIN, only identifies the year of manufacture, the manufacturing plant, and the sequence of production. The derivative VIN is stamped on a vehicle's engine, transmission, and frame.

learned the actual identity of the stolen 1991 GMC Jimmy from the derivative VIN that was stamped on the engine, transmission, and frame of the vehicle. The 1991 GMC Jimmy is the subject of counts 4, 5, and 6 of the indictment.

Inside the garage in the right bay next to the stolen 1993 green and tan Blazer was a beige 1989 Oldsmobile 88 stolen from Merrillville, Indiana on July 7, 1992. The covering on the steering column of the Oldsmobile had been broken into to allow the car thief to hot-wire and start the vehicle without a key.

In the shed next to the garage, the agents also recovered a 1991 S–10 pickup truck that had been stolen from James Hutnik in Harvey, Illinois on October 20, 1992. The door lock had been forced and the steering column had been broken into. The Hutnik Chevy S–10 is the subject of Count 3 of the indictment.

The agents also discovered a white 1991 Chevrolet S–10 pickup truck licensed to a Hal Huering Chevrolet Cadillac dealership in Valparaiso, Indiana on July 8, 1991, and a black 1991 Pontiac Grand Am titled to a Paul Sur Pontiac dealership in Merrillville, Indiana, on June 3, 1991, on the left side of the garage. The steering columns of both vehicles had been broken into to release the locking mechanism and to permit the vehicles to be hot-wired and started without a key.

Next to the retagged Rentschler/Duncan GMC by the building with the collapsed roof were a white 1988 Chevrolet Monte Carlo SS stolen from Charles Jefferson in Hammond, Indiana on September 26, 1992, and a red four-door 1992 Chevrolet Blazer stolen from Lori Caputo in Munster, Indiana on Novem-

ber 3, 1992. The steering column of the Caputo Blazer was peeled back to allow the ignition switch to be disconnected and hot-wired. Inside the Caputo Blazer, the agents found a piece of door post with the federal door sticker from a salvage 1992 Blazer that Evans had purchased from Tech–Cor. The agents discovered the public VIN for the salvage Blazer and two special rosette rivets [5] in a drawer in a tool box in the garage.

Special Agent Arthur Grist, Jr. testified that as he was transporting Evans to the Hammond jail, Evans wistfully commented that he was "glad it was finally over." After inquiring if the agents could relate to his relief, Evans volunteered:

> I'm glad that it's over. You know what you have been doing is wrong, but you have been doing it so long, there is no way to stop.

At trial, Evans' counsel objected to the government's introduction of evidence of five stolen vehicles found on the premises not charged in the indictment as well as the materials for retagging one of those vehicles and the phony inspection affidavits. The trial court admitted the evidence under Fed. R.Evid. 404(b) for the sole purpose of proving the defendant's intent and knowledge as to Counts 2 and 3, and the court gave the jury a limiting instruction immediately after the evidence was admitted and again before they began their deliberations.[6]

## II. ISSUES

In his challenge to the district court's order denying his motion to suppress, Evans

---

5. The rosette rivets are used to affix a public VIN to a vehicle's dashboard and are not generally available to the public.

6. The trial court instructed the jury as follows:
   Ladies and Gentlemen, you have heard and seen evidence concerning several vehicles:
   a 1992 Green Chevy Blazer, VIN 1GNDT13W6N2200902;
   a 1989 Beige Oldsmobile, VIN 1G3CW54C5K1319758;
   a 1988 white Chevy Monte Carlo, VIN 1G1GZ11G6JP119758;
   a 1991 White Chevy S–10 Pickup, VIN 1GCC51425M2313478;
   a 1992 Red Chevy Blazer, VIN 1GNDT1324N2147403; and

a 1991 Black Pontiac Grand Am, VIN 1G2NE1469MC628397.
   You have also heard the testimony of Mary Jane Wischler, Charles Earl Jefferson, Lori Dianne Caputo, Paul Pumroy, Ronald Hanzel and Bill Tucker concerning these motor vehicles.
   Any and all testimony and other evidence regarding these vehicles is offered by the government only to prove the defendant's intent and knowledge in Counts 2 and 3 of the Indictment. I instruct you that this evidence may not be considered by you for any other purposes.

alleges that the court erred in ruling that the police had probable cause for his arrest and that the agents had obtained a valid consent to search the premises at 925 South State Road 2 in Hebron, Indiana. Evans also contends that the trial court improperly admitted evidence pursuant to Fed.R.Evid. 404(b) and Fed.R.Evid. 403 concerning the discovery during the search of five stolen cars not charged in the indictment. Finally, Evans asserts that the district court clearly erred when it refused to reduce his base offense level for acceptance of responsibility under Guidelines § 3E1.1.

## III. ANALYSIS

### A. Motion To Suppress

#### 1. Probable Cause

■ Evans contends that the FBI agents lacked probable cause to enter Glenn Evans' premises. Evans also contends that the agents lacked probable cause to arrest him. Probable cause exists if under the totality of circumstances it was reasonable for the officer to believe that a particular individual had committed a crime. *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992); *United States v. Valencia,* 913 F.2d 378, 382 (7th Cir.1990) ("Probable cause involves a practical, common sense determination about whether, given all the circumstances present, it is reasonably probable that a person has committed or is committing an offense."). Agent Roth testified at the suppression hearing that the two confidential informants advised the agents that the vehicles stolen by Mauger were disposed of at an unknown location. In ruling that the agents had probable cause to arrest Evans, the district court stated:

> The facts confronting the FBI on December 10, 1992, when taken as a whole, clearly justify defendant's warrantless arrest. The FBI observed a new Chevy Blazer with a stolen, Illinois dealer license plate leave the home of Christopher Mauger, a man suspected of stealing cars. The FBI's suspicions about Mauger were not baseless; two reliable, confidential informants had told the FBI that Mauger and

others stole cars and affixed thereto stolen dealer license plates. Thus the FBI reasonably believed that the Chevy Blazer leaving Mauger's home on December 10, 1992, was stolen, and in hopes of learning the source of Mauger's car theft ring, the FBI followed the car.

> The car pulled into a garage on the property located at 925 South State Road 2. Surrounding the garage were numerous vehicles. Based on all these facts, a person of reasonable caution could have believed that the garage into which the Blazer drove was involved in Mauger's car theft scheme. Consequently, the FBI reasonably believed a crime—the possession of stolen property—was being committed in the garage ..., and the FBI properly arrested the persons found therein, including the defendant, without a warrant.

■ We review a district court's ruling on a motion to suppress evidence for clear error. *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994); *United States v. Wilson,* 2 F.3d 226, 229 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1615, 128 L.Ed.2d 341 (1994). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Tilmon,* 19 F.3d at 1224 (citing *United States v. Rice,* 995 F.2d 719, 722 (7th Cir.1993)). A defendant seeking to suppress evidence bears the burden of making a prima facie showing of illegality. *United States v. Randle,* 966 F.2d 1209, 1212 (7th Cir.1992).

■ The agents' approach to the garage did not implicate a Fourth Amendment interest because Evans did not present any evidence at the suppression hearing that he had a reasonable expectation of privacy in the driveway. *See Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 510–11, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection."); *United States v. Ventling,* 678 F.2d 63, 66 (8th Cir.1982) (no reasonable expectation of privacy in driveway and area around front porch where observations were made in public view); *United*

*States v. Humphries,* 636 F.2d 1172, 1179 (9th Cir.1980) (where automobile parked in driveway was visible from street and driveway not enclosed, no reasonable expectation of privacy that would preclude officer from entering driveway to check on the license plate number of parked car), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981); *see also* 1 W. LaFave, Search and Seizure § 2.3(e), at 407 (1987) ("It is not objectionable for an officer to come upon that part of [private] property which has 'been opened to public common use.' The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route 'for the purpose of making a general inquiry' or for some other legitimate reason, they are 'free to keep their eyes open'....") (footnotes omitted). There was no evidence that the public had limited access to Glenn's driveway, hence Evans had no reasonable expectation that members of the public or FBI agents would refrain from entering it.

■ The district court's finding that the agents had probable cause to arrest Evans was supported by the government's evidence admitted at the suppression hearing. Two informants had advised the agents that Mauger was a car thief with a penchant for stealing Chevy Blazers and pickup trucks. The informants disclosed that Mauger and his cohorts would steal the vehicles from dealers and then affix license plates stolen from another car dealer. Agent Roth testified that the agents had conducted surveillance of Mauger's group and observed them stealing vehicles and attaching stolen dealer plates. Furthermore, the informants told the agents that Mauger delivered the stolen vehicles to another location for disposal. On December 10, 1992, the agents observed the Blazer in Mauger's driveway and verified that the dealer license plate had been stolen from Currie Motors. The agents contacted Currie Motors and learned that they did not sell Chevy Blazers. On the evening of December 10, 1992, the agents followed the Blazer from Mauger's house to Glenn's garage, where the vehicle was promptly driven into the garage out of plain view. The combination of the stolen plates, the information gained from the confidential informants concerning Mauger's operation, and the wealth of corroborative information gained from surveillance of Mauger's group on this occasion and in the past were " 'sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)); *see also United States v. Maher,* 919 F.2d 1482, 1487 (10th Cir.1990) (combined weight of stolen plates, unregistered status, and inability to produce ownership documents produced probable cause for arrest). We hold that the district court did not clearly err in finding that the agents had probable cause for believing that the individuals inside the garage were in possession of a stolen vehicle.

## 2. Validity of Consent To Search

Evans asserts that the search was invalid because Glenn did not have authority to search the right side of the garage. Furthermore, Evans argues that even if Glenn had authority to consent, the consent was involuntary. Finally, Evans contends that the agents search of the entire garage, the shed, and all vehicles on the property exceeded the scope of the consent, which Evans suggests was limited to a search of the right bay of the garage.

### a. Glenn had Authority To Consent to the Search

■ "[T]he consent of one who possesses common authority over [the] premises ... is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *see also United States v. Rosario,* 962 F.2d 733, 736 (7th Cir.1992); *United States v. Duran,* 957 F.2d 499, 503 (7th Cir.1992). The Supreme Court explained in *Matlock* that common authority "rests ... on the mutual use of the property by persons generally having joint access or control for most purposes." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. The government has the burden of

establishing that Glenn had the required common authority to consent to a search. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797–98, 111 L.Ed.2d 148 (1990).

■■■ The district court did not commit clear error in determining that Glenn possessed common authority to consent to a search of the garage that was valid against Evans. While common authority is not premised on ownership interests in the property to be searched, mutual use by one having joint access for most purposes suffices. *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. Glenn, who owned the garage and paid all utility bills for the structure, allowed his son to use the right bay of the building. Agent Roth testified that Glenn stated that he had keys to the entrance doors to both bays, but that he had lost the key to the right bay's entrance door. Glenn testified that he had unobstructed access to the right bay when the interior door separating the bays was left unlocked, which it commonly was. Glenn stated that he did not have to ask his son's permission to enter the right bay, although it was used for his son's business. Glenn made it clear in his testimony that he did not need to ask his son's permission to consent to a search of the right bay.

### b. Glenn's Consent was Voluntary

This court reiterated the standards governing the voluntariness of consent searches in *United States v. Betts,* 16 F.3d 748 (7th Cir.1994):

> "Consent searches are valid only if the consent was freely and voluntarily given.... The question of whether a consent was voluntary, as opposed to the product of duress or coercion, 'is a question of fact to be determined from the totality of circumstances.' [*Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973)]. The government bears the burden of proving voluntariness by a preponderance of the evidence, *id.* at 222, 93 S.Ct. at 2045; *United States v. Lechuga,* 925 F.2d 1035, 1041 (7th Cir. 1991), and we will not reverse a district court's finding on this issue unless clearly

erroneous. *United States v. Talkington,* 843 F.2d 1041, 1047 (7th Cir.1988)."

*Id.* at 753 (quoting *United States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992)).

The totality of circumstances in this case supports the district court's ruling that the FBI agents obtained consent to search the premises from Glenn voluntarily. Contrary to the defendant's contention, the circumstances of Glenn's consent bear no resemblance to that presented in *United States v. Talkington,* 843 F.2d 1041 (7th Cir.1988), which the defendant relies upon. In *Talkington,* we remanded to the district court for factual findings on whether a consent to search was obtained through coercion when the record revealed that government agents had "burst into the Talkington home, at night, with weapons drawn." *Id.* at 1048. Once inside, the agents allegedly yelled at Talkington, falsely claimed that they were in the process of obtaining a search warrant, and repeatedly threatened to conduct a body cavity search of Talkington's wife. This court found "a strong suggestion in the record that there was a causal relationship between the threat to subject [Talkington's wife] to this highly intrusive examination and Mr. Talkington's consent to the search of the house." *Id.* at 1049.

■■■ From our review of the record there was no evidence adduced at the suppression hearing which suggested that Glenn's consent was involuntary, nor has the defendant pointed out any such evidence to us. Agent Warner never forced his way into the house, and the agent testified that he never entered the house. Although Warner had his gun drawn and at his side when he approached the house and spoke to the defendant's father Glenn, Glenn testified that he did not see the weapon. Glenn also testified that when he walked to the garage fifteen minutes after Ron's arrest, he did not see any guns drawn. Agent Roth testified that up to fifteen agents were on the property, but Glenn never conversed with more than two at a time.

While the initial exchange at the house between Warner and Glenn was boisterous, Glenn's daughter testified that everyone had calmed down while Glenn was still in the

house. Glenn demonstrated that he was not intimidated when he went to the garage to learn what was going on, ignoring an agent's earlier instruction to stay away from the garage. Glenn testified that he defiantly told the agent cautioning him from going outside that the property was his property and he would go where he pleased. The conversation with Agent May concerning the consent to search was unremarkable and noncoercive.

The consent is not tainted because the agents informed Glenn that they would obtain a search warrant if Glenn would not consent to a search. Police may not threaten to obtain a search warrant when there are no grounds for a valid warrant, but "[w]hen the expressed intention to obtain a warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent." *United States v. White*, 979 F.2d 539, 542 (7th Cir.1992); *Duran*, 957 F.2d at 502. At the time the agents informed Evans that they would seek a search warrant, they knew that a vehicle bearing a stolen license plate was in Evans' garage; the vehicle had been driven from a suspected car thief's home; the suspected car thief's modus operandi was to affix stolen plates to stolen vehicles; this suspected car thief delivered the vehicles he stole to a third party; and numerous other vehicles were parked on and around the premises. " 'Probable cause is established whenever there is a reasonable probability of finding the desired items in a particular location.' " *United States v. Hendrix*, 752 F.2d 1226, 1230 (7th Cir.) (quoting *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir.1982)), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985). There was a reasonable probability that evidence of the car theft operation would be found on Glenn's premises. The agents could have obtained a search warrant, thus expressing their intention to do so to Glenn did not vitiate Glenn's consent.

The district court found, and we agree, that credible evidence supports the conclusion that Agent May informed Glenn on two separate occasions that the agents could not search without a warrant absent Glenn's consent, and that Glenn could refuse to consent to a search. The district court

found that while May did not read the form to Glenn or explain all of the form's contents, such as the breadth of the search, the agent adequately apprised Glenn of his constitutional rights. Furthermore, Agent Roth testified that Glenn consulted with his son about consenting to the search and that both agreed prior to Glenn signing the consent form that consent would be prudent. Glenn testified that despite his failure to read the consent form, he never objected to the extent of the search. A person's "conduct can be indicative of the scope of a consensual search." *United States v. Berke*, 930 F.2d 1219, 1223 (7th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 269, 116 L.Ed.2d 221 (1991); *see also United States v. Hardin*, 710 F.2d 1231, 1236–37 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983). Nothing in the record suggests that Glenn intended his consent to search to be narrower than that which appears on the consent form, which allowed the agents to search the entire premises. In finding that Glenn's consent was voluntary, the district court noted,

> [O]nce at the garage area, the agent with whom [Glenn] spoke, Agent May, never raised his voice at or phrased his questions in a manner that might intimidate [Glenn]. Again, [Glenn] appears to be an intelligent person who is not apt to be terrorized into submission by the police, especially in light of the fact that when told by the FBI not to go over to the garage area, [Glenn] decided to go anyway. Had he felt he needed more time in which to calm down and assess the situation, the court is satisfied [Glenn] would have made his feelings known.

The evidence adduced at the hearing demonstrates that, under the totality of circumstances, Glenn's consent to the search was voluntary and informed, and the search was executed within the scope of that consent. We hold that the district court did not commit clear error in concluding that Glenn's consent to search was voluntary.

**B. Rule 404(b) Evidence**

Evans asserts that the district court's admission into evidence of five stolen

vehicles not charged in the indictment as well as materials for retagging the vehicles and the fraudulent inspection affidavits violated Fed.R.Evid. 404(b) and Fed.R.Evid. 403.[7] The court admitted the evidence after determining that it met all four prongs of this circuit's test for admission of other crimes, wrongs, or acts under Rule 404(b). The court read a limiting instruction to the jury when the evidence was admitted and as part of the jury's final instructions. We review the district court's decision to admit the disputed evidence for an abuse of discretion. *United States v. Flores*, 5 F.3d 1070, 1080 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994). The test for admissibility of Rule 404(b) evidence is whether,

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Shields*, 999 F.2d 1090, 1099 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994); *see also United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir.1994).

The evidence of the other stolen cars established Evans' knowledge as to the character of the stolen vehicles charged in counts 2 and 3 of the indictment and his intent in possessing them. The salvage VIN and federal VIN sticker for the red 1992 Chevy Blazer stolen from Lori Caputo and the blank inspection affidavits demonstrated Evans' modus operandi, and plan and scheme for retagging the stolen vehicles listed in the indictment. This evidence demonstrated Evans' method for retagging the 1991 GMC Jimmy stolen from James Duncan with the public VIN from a salvage vehicle as charged in Count 4. Second, the other-acts evidence, which reaches back in time to no earlier than June 3, 1991, when the black Pontiac Grand Am was stolen, is certainly close enough in time to be relevant to the December 10, 1992, date of the events charged in the indictment. *See United States v. Smith*, 995 F.2d 662, 672 (7th Cir.1993) (evidence properly admitted when two years separated the prior act and the charged act), *cert. denied,* —— U.S. ——, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994). Third, the challenged evidence supports a jury finding that Evans received, possessed, and concealed a stolen motor vehicle as alleged in Counts 2 and 3, and that he knowingly possessed with intent to sell the 1991 GMC Jimmy with an unlawfully altered VIN as alleged in Count 4. Finally, the probative value of the evidence of other stolen vehicles on the premises, the retagging materials, and the blank affidavits is not substantially outweighed by any danger of unfair prejudice. The evidence of the five stolen cars not charged in the indictment, the materials for retagging the vehicles, and the inspection affidavits, clearly satisfied the test for admissibility. Furthermore, when the evidence was admitted and during final instructions, the district court admonished the jury that it was to consider the disputed evidence only as to the issue of Evans' intent and knowledge concerning the acts alleged in Counts 2 and 3. The limiting instruction limited any prejudice, and we presume the jury obeyed the

---

7. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed.R.Evid. 403.

Rule 404(b) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. Fed.R.Evid. 404(b).

court's instruction. *See United States v. Bell,* 980 F.2d 1095, 1098 (7th Cir.1992).

### C. Evans' Sentencing Challenge

■■■ Evans' final challenge is to the district court's refusal to grant him a two-level reduction in his base offense level for acceptance of responsibility under Guidelines § 3E1.1. The district court's determination that a defendant has not accepted responsibility for his conduct is a factual one and is subject to review only for clear error. *United States v. Tolson,* 988 F.2d 1494, 1497 (7th Cir.1993). Application Note 5 of § 3E1.1 states: "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, comment. (n. 5). In seeking to demonstrate that he is entitled to a sentence reduction for acceptance of responsibility, the defendant bears a heavy burden. *United States v. Beal,* 960 F.2d 629, 632 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992).

Section 3E1.1(a) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). The Guidelines commentary adds the following:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted re-

sponsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1, comment. (n. 2).

■■ Evans asserts that he was entitled to a reduction because he "cooperated with F.B.I. agents and even made admissions to an agent after his arrest" and "cooperated with his probation officer in preparation of his pre-sentence report." Contrary to Evans' assertion, he was not entitled to a § 3E1.1 reduction. While Evans admitted to possessing the stolen vehicles and to retagging the stolen Duncan Blazer to government agents on the night of his arrest, he stoutly denied his guilt of the bank fraud charge to Agent Roth after he was charged with that offense. He thereafter proceeded to trial on all of the charges, and continued to deny his guilt of the bank fraud charge in his interview with the probation officer and at sentencing. "A defendant 'accepts responsibility' only when he 'fesses up' to his actual offense." *United States v. Escobar–Mejia,* 915 F.2d 1152, 1153 (7th Cir.1990); *see, e.g., United States v. Chandler,* 12 F.3d 1427, 1435 (7th Cir.1994) (quoting *Escobar–Mejia* ); *United States v. Pitz,* 2 F.3d 723, 732 (7th Cir.1993). This Evans did not do. Evans' acceptance of responsibility for Counts 2 through 5, but not the bank fraud charge in Count 6, was insufficient to warrant a two-level reduction in his base offense level under § 3E1.1. *E.g. United States v. Kozinski,* 16 F.3d 795, 820 (7th Cir.1994); *United States v. Guadagno,* 970 F.2d 214, 224 (7th Cir.1992). No clear error occurred.

### IV. CONCLUSION

Evans' conviction and sentence are

A FFIRMED.