DECISION
Before the Court for decision are two Motions to Suppress Evidence filed by Defendant Carl White. The motions are directed at the seizure of a computer at his home and the subsequent search pursuant to a warrant of the stored electronic contents of that computer. Defendant argues that the initial seizure by the State Police was without lawful consent. Moreover, because the warrantless seizure of the computer was unlawful, he argues that any search subsequently conducted pursuant to warrant must be suppressed.
 Facts
The following facts were developed during an evidentiary hearing held on April 27 and May 1, 2007. Carl White is under strict supervision by the Sex Offender Division of the Probation Department. He resides in a trailer home located in a trailer park in Middletown, Rhode Island, together with at least one other convicted sex offender.
Probation Officer Christopher Frenier testified that as White's probation officer, he attempted to ensure that White received appropriate counseling, was appropriately housed, maintained routine office visits, and was occasionally subjected to home visits. Frenier indicated that, like with any other sex offender, White's supervision was tailored to the perceived risk he *Page 2 
presented to society and his individual needs. Frenier has had frequent contact with White over the past two years.
Frenier testified that a major problem with supervising White was the defendant's attitude that the crime for which he is serving a deferred sentence is "victimless." In Frenier's eyes as a trained probation officer who monitors various sex offenders, White has a "huge issue" with accountability — recognition that possessing child pronography is both bad and illegal.
At around 9:00 a.m. on September 27, 2006, Frenier went to the defendant's trailer home at 11 Scottie Drive. The trailer is of a common size for residential use and as of that date, the defendant shared the residence with Gerard Godin, who is also on sex offender supervision, and a third individual, "Andrew." Following his knock, White met Frenier at the door to the trailer home. Frenier asked to be permitted to enter so that he could check to see what White had been viewing on his home computer. Importantly, the case concerning which defendant White is on probation involved his possession of child pornography on a computer system.
White responded that Frenier could check his computer, saying, "I have nothing to hide." As Frenier entered the trailer home, he noted that two other persons were present, apparently watching television. Frenier and the defendant proceeded to White's bedroom located in the rear of the trailer where the computer at issue was located. The defendant typed in his password and at that point Frenier started reviewing information saved and available through selecting the "history" icon. As Frenier explained during his testimony, by reviewing the "history" icon materials, he was able to determine what the user of the computer (presumably White) had been viewing at an earlier time.
As Frenier proceeded to examine the prior viewings of the defendant, he clicked on to a site which displayed a female child of approximately two years of age who was seated naked in *Page 3 
what appeared to be a bathtub. Frenier inquired of White as to whether or not he knew the child and the defendant responded, "No, I don't know how the image got there." Frenier, who is familiar with the appearance of young children because he is the father of boys aged two and six, clicked on to a second site which displayed two young males kissing. He estimated that they were approximately ten years old. Next Frenier clicked on to a third site which depicted a picture of a boy of about age fourteen. Frenier became upset with what he viewed on the computer screen of his probationer and he expressed his concern and anger before leaving the trailer.
Frenier went immediately to the Portsmouth Police Station where he spoke with Lieutenant Furtardo and Detective Steven Burns about the images he had observed on the defendant's computer. At about 10:30 A.M., Frenier returned to defendant's trailer home. This time he was accompanied by Detective Burns.
In response to Frenier's knock, White came to the door and was again told by Frenier that Frenier did not like what he had seen on the computer. Frenier asked if White would mind if Detective Burns looks at the "stuff." White responded, "Sure, I've got nothing to hide." Frenier and Burns entered the trailer home and proceeded to the defendant's bedroom. At the request of Frenier, the defendant logged in again with his password. It was at this time that Detective Burns sat down in front of the computer and went through several computer files. The files reviewed by Burns included, but were not limited to, the web sites/images which Frenier had previously observerd. It is conceded by the State that no consent form was utilized to memorialize the defendant's consent to the inspection of his trailer and the computer by Detective Burns. *Page 4 
Detective Burns searched the computer for between fifteen and forty-five minutes. Meanwhile, the other two occupants in the trailer continued to watch television in the living area. After viewing several computer files, Detective Burns called his lieutenant to advise his superiors what he had seen and to inquire as to what he should do. Detective Burns testified that because the Portsmouth Police Department did not have the technical means to search computer files, his department contacted the State Police in Portsmouth in order to enlist that department's assistance.
Within a few minutes four uniformed and armed State Troopers arrived at White's trailer home. The lead State Police officer, Trooper Borek, testified that he and the other three troopers were dispatched to the location of White's home to assist in a Portsmouth Police Department investigation. Borek indicated that he did not know the purpose of his call to assist until he was briefed about the situation by Frenier and Burns immediately outside the trailer. Borek and the second trooper to arrive, Trooper Raynes, then entered the trailer and proceeded to the back bedroom to examine White's computer. There is no evidence that White opened his door or expressly authorized any state police official to enter his home or look at his computer.
As Trooper Borek was shown certain images on the computer by Frenier and/or Burns, White was directed to sit in the living area where the other two civilians were watching television. Borek explained that one of the troopers who arrived after him was assigned to watch the three men as a safety precaution. Although Borek testified that White was free to leave, the fact that a trooper watched over him and the two other men after directing all three to sit down in the television viewing area suggests that a reasonable person would not believe that he was free to exit the trailer. During the few minutes of examining images on White's computer, Borek observed at least three images of partially naked for fully nude children. One of these showed *Page 5 
two boys kissing. As a result of a review of the computer images, a trooper called a supervisor for instructions. Borek and his fellow troopers were instructed to seize the computer if they could obtain consent.
Following the call to their superior, Trooper Borek approached White and asked him if the police could seize his computer in order to determine the contents of its memory. Borek testified that he told White that he had the right to refuse to turn over the computer[1]but that if White did refuse, the police would get a search warrant. Moreover, Borek advised White that the officers would remain in his trailer until a search warrant could be obtained.
Borek and every other witness to testify as to White's response indicated that White said the police could take his computer. According to every witness, White seemed most concerned about when and if he would get the computer back. Borek explained to White that if there were no illegal materials found during a forensic examination of the computer, then he would get his computer back.[2]However, no effort was made to memorialize White's purported consent with a form which is prepared for situations just like that presented here. Trooper Borek testified that neither he nor any trooper on scene had a consent form even though it was routine that such forms were kept in every state police cruiser. Nor did Borek choose to return to the Portsmouth Barracks — perhaps as close as five minutes by car — to obtain a form there. Nor did Detective Burns supply a consent form for White to sign.
Following what Trooper Borek concluded was White's consent to seize the computer, Borek disconnected the memory unit from the peripheral attachments and left White's trailer *Page 6 
with the hard drive, memory unit. The hard drive was logged into evidence at the Portsmouth State Police Barracks for safekeeping. About two months later, November 27, 2006, Trooper Borek obtained a search warrant from the Rhode Island District Court which permitted the state police to conduct a forensic investigation and search the contents of the computer memory. That search apparently uncovered evidence which resulted in the charges now pending against White, the knowing possession of child pornography.
The defendant's intellect, education and maturity were the subject of substantial testimony. At age 51, White is able to communicate verbally reasonably well. However, at times, he is "slow." He did not finish high school where he was enrolled as a special education student. Rather, he continued his training at the Maher Center in Newport, a facility which offers a variety of programs for the mentally challenged. Thereafter, he has worked as a janitor or held similar jobs which require performance of only menial tasks. Although White did not testify, evidence of his intellect was adduced from his long time friend and intimate partner, Gerard Godin, who remained in the trailer during the three visits by law enforcement. Godin has known White since high school and has previously expressed his concern to Frenier that White spends too much time on the computer. Godin is aware that White has learning disabilities. Godin testified that White was nervous, tense and "actually scared" by the presence of the police that day. Moreover, because he, a former roommate, Andrew, and White were directed to sit in the television viewing area, Godin did not believe that any of the three of them were free to leave. White was certainly not free to observe what the police were doing in his bedroom with his computer.
Henry J. White provided additional testimony concerning his brother. Henry was a highly credible and significant witness. Henry manages all of the defendant's financial affairs *Page 7 
because, in his opinion, the defendant is easily taken advantage of. Henry confirmed that the defendant has limited education and intellect. The defendant actually worked at the Maher Center for several years before getting another job. Obviously having a close if protective relationship with his brother, Henry communicates virtually daily with the defendant, often to help out, provide advice, and keep the defendant from making a mistake. It is Henry's opinion that the defendant needs help to cope with the tasks of every day life.
 Discussion
From ancient English times, there has been no greater protected privacy interest than in one's home.[3] A multitude of courts have held that the constitutionally protected privacy expectations and protections are strongest when the state seeks to search an individual's home. And although a probationer may have a slightly reduced expectation of privacy, knowing that he will be visited on occasion by his probation officer, a probationer too enjoys the protections of both theFourth Amendment to the United States Constitution and Article I, Section 6 of the Rhode Island Constitution.
Here, the home visitation by Probation Officer Frenier was reasonable as was his entry into the defendant's home as authorized by defendant's express permission. So, too, was Frenier's examination of portions of the defendant's computer which was accomplished with White's consent. Finding images on the computer's memory that he believed were inappropriate if not illegal, Frenier properly proceeded to the local police department for advice and assistance. After discussing his findings with members of the Portsmouth Police, Frenier, accompanied by Detective Burns, returned to the defendant's home to investigate further. Again, the defendant *Page 8 
expressly allowed both Frenier and Burns to enter his home, after which he again entered a password to allow his law enforcement visitors to inspect areas of computer memory.
Burns examined several files in addition to those initially viewed by Frenier, also concluding that the images were inappropriate and indicative of a possible criminal violation. Burns called his supervisor for instructions on how to proceed. He was told that the State Police would be contacted because it was the only law enforcement organization which had the technical expertise to perform a forensic examination of computers. First two and then two more uniformed, State Police troopers arrived at the front of White's trailer. After being briefed on the situation outside by Frenier and Burns, Trooper Borek — soon followed by three other troopers entered White's home. This entry was without the express permission of the defendant. White and two others were ordered to sit in the television viewing area "as a safety precaution" and one of the four troopers was assigned to watch the three civilians. White was not allowed to accompany the State Police to his back bedroom or observe what the officers did with respect to his computer. A man of limited intelligence and education, who is unable to take care of his ordinary everyday affairs without constant help, was now surrounded by six law enforcement officers in his home. He was not allowed to move from his living room area[4] and was described by the man who knows him best as nervous, tense and "actually scared."
Trooper Borek was obviously not trained in the area of investigating child pornography offenses. He had one of the other troopers call their supervisor for instructions. The troopers on the scene were instructed to seize the computer if they could get "consent." Apparently no serious consideration was given to collecting the facts known about the defendant and the *Page 9 
computer's contents in support of a search warrant application.[5] No consent form was offered to the defendant to memorialize his informed decision to consent to a seizure of his computer.
Moreover, when asked by Trooper Borek if he would consent to the seizure of his computer, Borek told White that if he did not consent to the removal of his computer, the police would just get a warrant and stay in White's trailer until they obtained it.
Considering the totality of the pertinent facts and circumstances, this Court cannot conclude that the state has proved by a preponderance of the evidence that the verbal consent by White was freely and voluntarily given. See State v. Texter, A.2d (slip op. at 13) (R. I. decided 6/1/07) and cases cited therein.[6] Courts have identified five major areas of inquiry when determining whether the state has demonstrated voluntary consent. See generally, Schneckloth v.Bustamonte, 412 U.S. 218 (1973). One of these factors is the defendant's knowledge of his right to refuse consent. Despite Trooper Borek's assertion that he advised White of that right, this Court finds that the his recollection is faulty on this point. Although it is not required that police advise a defendant that he has the right to refuse consent to search, United States v. Forbes, 181 F.3d 1, 5-6 (1st
Cir. 1999), advising White of the right, particularly through the use of a written form, would have been substantial evidence of his voluntary consent. See United States v. Barnett, 989 F.2d 546, 556
(1st Cir. 1993) (consent to search deemed voluntary where defendant given Miranda warnings that he need not cooperate with officers). See also United States v. Hummer, 916 F.2d 186
(4th Cir. 1990) (several verbal warnings); United Statesv. Rivas, 99 F.3d 170 (5th Cir 1996) (consent form used);United States v. Evans, 27 F.3d 1219 (7th Cir. 1994) (advisement given *Page 10 
repeatedly); United States v. Sanchez, 156 F.3d 875 (8th
Cir. 1998) (repeated warning); United States v. Kaplan, 895 F.2d 618
(9th Cir. 1990) (suspect advised consent need not be given).
A second factor to consider is the defendant's personal traits and abilities — age, intelligence, education and language proficiency. This is a particularly important factor in this case.
As discussed above, White is of limited intelligence. He has difficulty performing daily tasks without help. He cannot perform routine financial transactions. He cannot hold any but the most menial jobs. Although he is basically communicative, his verbal responses are sometimes "slow." He is, as his brother explained, easily taken advantage of.
On the day in question, he first received an unannounced visit from his probation officer who, after viewing images on White's computer, forcefully expressed his displeasure with White. In the past, Frenier had threatened White with jail if he didn't "tow the line" regarding the requirements of his probation.
Not long after the departure of his probation officer, the probation officer returned with a detective. Thereafter, four armed and uniformed state police officers arrived and, without any invitation or express permission, entered and took over control of the defendant's home. The defendant was temporarily detained and limited in his movements. No one advised White that he could leave. No one advised him that he could exclude the officers from his home and demand that they get a search warrant. White, described by his roommate as "scared" by the escalating police presence, was obviously under duress and not likely to freely and knowingly give his consent to the seizure. Rather, any consent given was more akin to an "acquiescence to a claim of lawful authority."See Bumper v. North Carolina, 391 U. S. 543, 548-49 (1968). *Page 11 
Thus, this Court concludes that his low level of intelligence, fear of his probation officer, temporary investigative detention, and the inherent coercive nature of having six police official in his home — four without his express consent — militate against finding that his verbal consent to seize the computer was voluntary.
A third factor this Court considers is the degree to which White cooperated with the police. See, e.g., United States, v. Blais,98 F.3d 647, 648, 650 (1st Cir. 1996). Clearly, White was cooperative at the time of the initial visit by Frenier who had been to White's home in the past. White declared, "I have nothing to hide." He then proceeded to allow Frenier to peruse a portion of his computer after logging in the password. However, common sense suggests that by the time Frenier left White's home, he was nervous. No doubt White's discomfort was escalated when, just a few minutes later, Frenier returned with Detective Burns.
It is uncontested, however, that White allowed both men into his trailer, again logging in a password[7] so that Burns could review some computer images. Burns called his superior for advice and he and Frenier then left the trailer and waited outside. Next, four cars with state police troopers arrived, all within a minute or two of each other. The troopers together with Frenier and Burns entered the trailer, this time without invitation or consent by White. White was directed to sit down in the living room and not move. He and his companions were watched over by one of the four troopers. White's home had been taken over by law enforcement and any investigative decisions were being made by state police officers who were never invited to enter. Thus, it is not surprising that White was "scared" and intimidated. A question of concern to this Court is whether White was cooperative or emotionally overwhelmed. It appears to the Court *Page 12 
that White believed that he had to just "go along" with police requests once they took control over White's home.
A fourth factor to consider is the individual's attitude about the likelihood of the discovery of contraband. Some courts find that a suspect's belief that he had successfully secreted the contraband and, thus, had no belief that it would be discovered, is an indication that the consent was voluntary. See e.g., United States v. Crespo,834 F.2d 267, 272 (2nd Cir. 1987) (defendant did not believe that officers would find hidden items); United States v. Rivas, 99 F.3d 170,176 (5th Cir. 1996) (defendant's consent to search valid because he believed that officers would only find a small amount of drugs, not the major stash). Here, White may have appeared cooperative. The initial searches by Frenier, Burns and Borek did not reveal any images, the possession of which is illegal, per se. Rather, the discovery of illicit materials was made possible only after computer experts brought the hard drive memory unit to a computer laboratory for a forensic examination.[8]
Finally, this Court looks at a fifth factor, the length of White's investigative detention, the nature of any questioning, and any coercive police behavior. Law enforcement authority figures were in and out of the defendant's home without a warrant for approximately two hours. During the presence of the state police, four in number, the defendant was required to sit in his living room under the watchful eye of one of the troopers. He was told to remain. He was not subjected to substantial interrogation, but neither was he free to leave. Quite clearly he was sufficiently intimidated so as to not think of requesting that the police leave. He was not shown a consent form. He was not given hisMiranda warnings. Rather, White was told that if he did *Page 13 
not give his consent to the removal of his computer memory, the police would stay in his home until a search warrant was obtained.[9]See United States v. Winningham, 140 F.3d 1328, 1331-32
(11th Cir. 1998) (consent not voluntary because 6 armed officers present and suspect not told that he could leave or informed of his right to refuse consent).
No single factor is dispositive of the inquiry that a Court must make in consent to search cases. Schneckloth, 412 U.S. 226-27. Accordingly, this Court looks at all the relevant factors in the context of this residential search at the home of a mentally-limited probationer. On balance, this Court cannot conclude that the State has satisfied its burden to prove by a preponderance of the evidence that the consent given by White was voluntary.
Had the police obtained written consent, whereby the defendant acknowledged his understanding to refuse consent[10] and to terminate the officers rummaging through his home, the result may well be different. Had White been afforded his Miranda rights during which he would have been reminded of his right to secure counsel before answering questions and giving oral consent, voluntariness may have been demonstrated. Were White not so mentally limited, frightened on the occasion at issue, easily taken advantage of, and more capable of performing every day tasks, this Court's decision might be different. But this Court cannot conclude that the verbal consent here was voluntary in the Fourth Amendment sense. This is a most unfortunate result. However, the recent observation by our high Court in State v.Casas, 900 A.2d 1120, 1135 (R. I. 2006), needs to be repeated here. *Page 14 
"It long has been recognized that the exclusionary rule is a prophylactic device designed to deter constitutional transgressions by law enforcement. . . . The public has a right to be protected from illegal searches and seizures, and `the procedural safeguards that were violated in this case guarantee constitutional rights to `those suspected of being or known to be, offenders as well as to the innocent. (Citations omitted)."
Accordingly, the motion to suppress the warrantless seizure of defendant's computer memory is granted. The results of the subsequent examination of the computer pursuant to a search warrant must also be suppressed as they are obviously fruits of the initial, unconstitutional search. See generally, Wong Sun v. United States, 371 U.S. 471, 487-88
(1963); State v. Chiellini, 557 A.2d 1195 (R. I. 1989).
[1] None of the reports prepared by Trooper Borek concerning his investigation that day reflect that he advised White that he could refuse the police request to take his computer. Borek's testimony in this regard is disputed. This Court finds that Trooper Borek, testifying from memory about a detail of an event some seven months earlier, is likely mistaken.
[2] Apparently, White did not get his computer back after it was seized by law enforcement and he was charged with possessing computer images of child pornography in 2004.
[3] Derived from ancient common law, the phrase "Man's home is still regarded as his castle . . .," State v. Joseph, 337 A.2d 523, 527 (R. I. 1975), may very well be the precursor for the fourth amendment.
[4] Although witness Gerard Godin testified that he remembered that White accompanied the police to the back bedroom, Trooper Borek testified that White was instructed to sit in the living room while Frenier showed him the computer.
[5] This was a weekday when several judicial officers were available at the nearby Newport County Courthouse.
[6] In an earlier case, State v. Leavitt, 237 A.2d 309, 318 (R. I. 1968), the Rhode Island Supreme Court adopted a more rigorous standard, "clear and convincing evidence."
[7] It is unknown to the Court how many passwords were associated with the subject computer. It may be — but has not been established by the evidence — that White believed that multiple passwords would keep secret various portions of his computer's memory which were not accessible by using the single password that White used to allow law enforcement access to some files.
[8] At this stage of the case proceedings, there is no child pornography before the Court. Because the defendant has been charged with the possession of illicit images, the Court has concluded that the forensic examination of the hard drive memory unit resulted in the discovery of the offensive images. This is, of course, a conclusion buttressed by a reading of the criminal information package.
[9] It is only proper that the police protect the computer from tampering while a search warrant application was made and submitted to a judicial officer. However, the owner/tenant of premises should be given the option of having the police stay on the premise or having all persons leave the premises for a reasonable period of time while a warrant application is made.
[10] The failure to inform a suspect that he has the right to refuse consent is, of course, not determinative. However the failure to inform, combined with other factors, may result in a finding that the consent was not voluntary. For example, in United States v. Jones, 846 F.2d 358,360-61 (6th Cir. 1988), the Court held verbal consent not voluntary where police did not advise defendant of his right to refuse, did not give Miranda warnings, defendant was illiterate and cooperated only because he thought he was under arrest.