UNITED STATES of America, Plaintiff,

v.

Oliver LUNA–ROJAS, Defendant.

No. CRIM. 97–129(DRD).

United States District Court, D. Puerto Rico.

Nov. 10, 1998.

Guillermo Gil, United States Attorney, Antonio R. Bazán, Assistant U.S. Attorney, San Juan, for plaintiff.

Edgar R. Vega–Pabón, San Juan, PR, for defendant.

## ORDER

DOMINGUEZ, District Judge.

Pending before the court is the Magistrate Judge's Report and Recommendation, (Docket No. 38), as to defendant Oliver Luna Rojas's Motion to Suppress, (Docket No. 16). The United States opposed the motion, (Docket No. 18 and 22).

■■■ The Hon. Magistrate Judge, Aida L. Delgado, recommended that the Motion to Suppress be denied. The Report and Recommendation further forewarned that failure to file objections to the report foreclosed the right to review by the District Court and further that the report and recommendation did not confer entitlement to a de novo review. *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986). The court pursuant to local Rule 510.1 shall only review de novo those portions of the report and recommendation to which an objection is made. Federal Magistrates Act, 28 U.S.C. § 636(b)(1). De novo review is waivable should no timely objection be filed. *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1980); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *United States v. Escoboza Vega,* 678 F.2d 376, 379 (1st Cir.1982). Moreover, "absent objections by the plaintiff, the district court had a right to assume that [defendants] agreed to the magistrate's recommendation." *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir.), cert. denied 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985). Since no objection has been filed, the court assumes that defendant accepts the report and recommendation.

■■■ The court notwithstanding understands that the report and recommendation constitutes "a comprehensive, well-reasoned decision" warranting this court to "refrain from writing at length to no other end than to hear its own words resonate." *Lawton v.*

*State Mutual Life Assurance Company of America,* 101 F.3d 218, 220 (1st Cir.1996). The court adds only that considering the unchallenged factual scenario the protective sweep made by agents at the Luna family residence was justified under the doctrines of *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), and *United States v. Curzi,* 867 F.2d 36, 39 (1st Cir.1989). Further, the court notes that no materials were seized during the sweep the same being short in duration and not overall coercive and intimidating. The court further concludes that although there was no search warrant to conduct a search of the Luna family's residence wherein defendant lived, the United States satisfied the burden of consent of the search by codefendant's father and brother, thus complying with the exception set forth in the cases of *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) and *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), specially since the consent to the search was provided by the owner of the house (Mr. Luna–Mateo—defendant's father), over areas of "common usage" and sharing with Oliver Luna–Rojas. Further, the search consent was voluntarily provided under the "totality of circumstances" scenario. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041.

**The Report and Recommendation of the Hon. Magistrate Judge is, therefore, adopted by the court.**

IT IS SO ORDERED.

## MAGISTRATE–JUDGE'S REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE

DELGADO–COLON, United States Magistrate Judge.

### A. Factual and Procedural Background

On June 6, 1997, a complaint and an arrest warrant were issued against defendant Oliver Luna–Rojas aka "Miguel Vega" (Luna–Rojas). The complaint, sworn by Ismael Rodríguez, SS/A U.S. Customs Service, stated that on or about June 2,1997, up to and including June 5, 1997, the defendant knowingly, will-

fully and unlawfully "did import into the United States from a place outside thereof, this is, from the Republic of Colombia and did possess with intent to distribute approximately two hundred and fifty (250) grams (gross weight) of heroin, a Schedule I, Narcotic Drug Controlled Substance." (Docket No. 1).

Three days later, on June 9, 1997, Luna–Rojas voluntarily surrendered to law enforcement authorities (Docket No. 2). On June 12, 1997, upon conclusion of the preliminary hearing and while assisted by counsel, defendant was held to answer before the Grand Jury for a violation to Title 21 U.S.C. § 841(a)(1). At the time, bail conditions were set (Docket Nos. 5 and 9). On June 25, 1998, the Grand Jury returned a true bill charging a violation to 21 U.S.C. § 841(a)(1) (Docket No. 6).

Upon receiving discovery, counsel for defendant petitioned the Court for the suppression of all evidence seized from Luna–Rojas' residence.[1] In his motion, filed on August 14, 1997, the defendant argues that:

1. Defendant's place of residence, more specifically defendant's bedroom, had been searched without a warrant and without his consent.

2. Any consent obtained from a third party (defendant's brother and/or father) was the product of coercion and, thus, not voluntarily given (Docket No. 16).

On August 19,1997, the government filed its response to defendant's Motion to Suppress. The government, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), asserts the validity of a warrantless search of some premises upon the voluntary consent of the person in control of said premises (Docket No. 18).

An evidentiary hearing on defendant's motion was initially held on October 20, 1997 (Docket No. 20) and October 22, 1997 (Docket No. 21). At the hearing, the government presented the testimony of three law enforcement agents while the defendant presented the testimony of his brother, Manuel Luna–Rojas (Manuel Luna), and Manuel's girl-

friend, Sonia Conde–Delgado (Ms. Conde) (Docket Nos. 28 and 32). Inasmuch as at the time, the government, in spite of its efforts, could not locate defendant's father, his testimony was proffered by means of a written sworn statement filed in November 1997 (Docket No. 22). The defendant, asserting his right to confront adverse witnesses and to cross-examination, petitioned for reopening of the hearing (Docket No. 23). A hearing at which the government presented the testimony of defendant's father, Manuel Luna–Mateo (Luna–Mateo) was held on December 10, 1997 (Docket Nos. 26 and 29).

After the evidentiary hearing, the government and defense counsel submitted their Memoranda of Law (Docket Nos. 31 and 37).

### B. The Evidentiary Hearing

At the evidentiary hearings, the government presented the testimonies of three (3) law enforcement agents and that of defendant's father, Manuel Luna–Mateo (Luna–Mateo). The first witness for the government was Ismael Rodríguez (SS/A Rodríguez), a Senior Special Agent, U.S. Customs Service, who was acting as the case agent. SS/A Rodríguez was in charge of preparing a written application for a search warrant, and upon instructions of the officer-in-charge of this investigation, at some point he was also present at the premises searched (Docket No. 32, Tr. p. 10). Manuel Zurita (Agent Zurita), an Agent for the U.S. Customs Service, and a member of the surveillance and search team, was the second witness testifying in regards to the search executed on June 5, 1997 (Docket No. 32, Tr. p. 35). The third witness was Dennis Knight (Agent Knight) who was acting as the operational supervisor coordinating the surveillance and search team. Agent Knight, a federal agent for the past 14 years, works for the Department of the Treasury, U.S. Customs Office of Investigation in San Juan, Puerto Rico (Docket No. 32, Tr. pp. 76–77).

The last witness for the government, a federal employee within the U.S. Postal Service, was Luna Mateo, defendant's father. Luna–Mateo is the owner of the residence

---

1. Actually, the residence to which reference is made in this case, belongs to defendant's father.

It is shared by defendant's father, defendant Luna–Rojas and an older brother.

located at 29th Street, 2–U–19, Mirador Bairoa, Caguas, Puerto Rico, object of the search warrant (Docket No. 29, Tr. pp. 4–5).

The defense presented the testimony of Manuel Luna and that of his girlfriend, Ms. Conde. Manuel Luna and Ms. Conde are gainfully employed as a project estimator for industrial air conditioning systems and as a dental assistant, respectively (Docket No. 28, Tr. pp. 3, 41).

From the testimonies and evidence presented, the following factual and legal conclusions are made:

On or about June 5, 1997, a box was sent from Colombia to the United States, via an airmail courier, Sky Net. The box entered into the jurisdiction via Miami, Florida, where it was subjected to a routinary inspection by U.S. Customs Service. The inspection revealed that the box contained three leather backpacks, a letter addressed to "Miguel," and a photograph. In addition, 385 straws were cautiously placed within the box's side panels. These straws contained approximately 250 grams (gross weight) of heroin. (Docket No. 32, Tr. p. 11) (Government's Exhibits 1A, 1B, 2, 3A, 3B, 4 and 5).

Upon its receipt, the U.S. Customs Service decided to attempt a controlled delivery. Accordingly, a similar (dummy) box was prepared and a measurable amount of the heroin previously seized was placed within the same. Also, an electronic beeper transmitter (tracking device) was set in place. The "dummy" box was addressed, as the original one, to: Street No. 29, Block 2U, No. 19, Caguas, Puerto Rico (Docket No. 32, Tr. pp. 12–13, 79, 97–98) (Government's Exhibit 7).

Prior to the date in which the controlled delivery took place, a representative of Sky Net named Miguel Rosley (Rosley), had reported to U.S. Customs Service having received two telephone calls from an individual who identified himself as Miguel Vega (Vega). According to Rosley, Vega had in-

quired about a package he was to receive from Miami, which he was to pick up upon receipt. As agreed with U.S. Customs Officers, the third time that Vega called he was told that the package was to be delivered to his residence (Docket No. 32, Tr. at pp. 13–14).

On June 5, 1997, a U.S. Customs Service van, driven by an undercover agent dressed in a Sky Net uniform, initiated its journey to Vega's residence. Around 6:45 PM, other units were already placed in the vicinity to conduct surveillance. The controlled delivery process was videotaped by government agents (Docket No. 32, Tr. pp. 14–15 and 36). The surveillance team was integrated by U.S. Postal and Customs agents deployed on the site, under the supervision of Agent Knight. SS/A Rodríguez[2] and Manuel Zurita, were also part of the surveillance/search team.

The controlled delivery took place on June 5, 1997, approximately at 7:50 PM (Docket No. 32, Tr. pp. 22, 38 and 78) (Government's Exhibit No. 6). The undercover agent parked his vehicle in front of defendant's residence. The defendant identified himself as "Miguel Vega," received the package, paid for delivery taxes and signed a receipt. The recipient, properly identified as Oliver Luna–Rojas, signed the receipt under the name of "Miguel Vega" (Government's Exhibit 6) (Docket No. 32, Tr. pp. 29, 36–39, 77–78).

Defendant was observed while taking the package inside the residence. Approximately ten to twenty minutes later the defendant left the residence, walked down the street and did not return (Docket No. 32, Tr. pp. 38–39). At the time Luna–Rojas left the residence, the agents assumed that the package had not been opened inasmuch as the electronic device placed in it had not signaled (Docket No. 32, Tr. pp. 27–28, 49–50, 86).

The surveillance team awaited in the vicinity. They wanted to determine who was to come for the package or what was going to

2. SS/A Rodríguez testified that at all times, while in the possession of an application for a search warrant directed against defendant's place of residence, he awaited nearby the residence of the on-duty judicial officer. He remained in radio contact with those agents on the site and was to receive instructions from Agent Knight as to whether there was or not a need to request a search warrant. Given the fact that consent to search was given by the parties, the application was never submitted to judicial scrutiny (Defendant's Exhibit A; Docket No. 32, Tr. pp. 17, 19–21, 26, 29–31, 34).

be done with it. Inasmuch as Agent Knight intended to retrieve the package from the residence, he also intended to request the residents' consent prior to submitting the application for a search warrant to a judicial officer. Accordingly, SS/A Rodríguez, who by then was in possession of the application for a search warrant, was also instructed to wait for further instructions (Docket No. 32, Tr. 30–34, 86–88). Thereafter, the U.S. Customs van from which surveillance of the front and rear doors of the residence was being conducted had to be removed from the area. This prevented the surveillance team from determining whether anyone entering the premises could also exit through a lateral or back alley (Docket No. 32, Tr. pp. 91–92, 96–97 and 99).

Approximately at 9:30 PM two persons were seen entering the house. The agents waited for twenty minutes and then proceeded to knock on the door and lateral windows while identifying themselves as police officers (Docket No. 28, Tr. pp. 7–9, 25; Docket No. 32, Tr. pp. 39, 41 and 78).

A female, later identified as Sonia Conde–Delgado (Ms. Conde), opened the door. Although there is controversy as to how much information she was provided by the agents at that time, it remains a fact that the law enforcement officers identified themselves as such and informed they were looking for a box previously delivered with contraband. Ms. Conde was immediately placed outside the house with a female officer (Docket No. 32, Tr. pp. 54, 58, 61, 80). The man identified as Manuel Luna, after having heard the agents knock at the door and lateral windows approached the front door where the agents stood. He was placed on the floor and briefly handcuffed (Docket No. 32, Tr. pp. 55, 60–61, 81, 95).

Four or five agents constituted a security sweep team inside the residence and secured the area. The security sweep lasted approximately five or seven minutes (Docket No. 32, Tr. p. 61). Meanwhile, Manuel Luna, who for security reasons had been briefly handcuffed, was allowed to move to the living room and sit on a sofa (Docket No. 28, Tr. p. 13; Docket No. 32, Tr. pp. 42, 81). While entering the residence, members of the security team had drawn their weapons, and without having aimed the same against any particular individual, kept the weapons in their holsters throughout the entire time after the protective security sweep was conducted (Docket No. 28, Tr. 17–18, 33; Docket No. 32, Tr. pp. 43, 58, 67, 81, 89–90).

Once at the residence, an agent proceeded to advise Manuel Luna of his Miranda Rights, which he acknowledged having understood (Exhibit 9; Docket No. 28, Tr. pp. 53–57, 62). Manuel Luna was further advised of the facts which motivated the agents' presence in the house and was provided with details surrounding the controlled delivery. Authorization to search the house was also sought from Manuel Luna (Docket No. 28, Tr. pp. 13–16, 29, 36–38, 43). The government agents do admit having told Manuel Luna that if he did not consent, a search warrant could be and was to be requested from a judge (Docket No. 32, Tr. pp. 64–65). However, as per Manuel Luna's admissions, this statement was given in response to his request to have Agent Knight's conversation with another agent translated (Docket No. 28, Tr. pp. 57–59; Docket No. 32, Tr. pp. 63–82).[3]

The evidence on record reflects that approximately at 10:05 PM Manuel Luna provided written authorization for the agents to proceed and search the house. While Manuel Luna does not claim not having understood the agents' explanations or not being able to foresee the possible outcome of said search, he claims the consent was not voluntarily given inasmuch as he was never told he could refuse to consent and was extremely nervous (Exh. 10; Docket No. 28, Tr. 60–61, 69; Docket No. 32, Tr. pp. 32, 43–44, 85, 91, 96).

While this was taking place and while in the process of advising Manuel Luna of his constitutional rights, Luna–Mateo (defendant's father) arrived at his house (Docket No. 32, Tr. pp. 82–85). All witnesses, except Manuel Luna, agreed that Luna–Mateo ar-

---

**3.** It appears that at some point, while being advised of his rights, Manuel Luna overheard Agent Knight, while speaking on his cellular phone presumably to SS/A Rodríguez, regarding the possible application for a search warrant.

rived at his residence prior to the search being conducted. Ms. Conde remembered vividly that Luna–Mateo entered the residence seconds after she did, described how he inquired on what was transpiring, the explanation he was given and the statements including the consent to search provided by Luna–Mateo to the agents (Docket No. 28, Tr. pp. 18, 20–22, 26–27, 33–34). Luna–Mateo was described as a man with an alcoholism problem who admitted drinking several beers prior to arriving at his house (Docket No. 28, Tr. p. 65; Docket No. 29, Tr. pp. 10,21). Nonetheless it appears that he arrived in his vehicle and did not impress Agent Zurita as being drunk. However, it remains a fact that upon entering his residence, even though he initially had a crying spell and an emotional outburst, he eventually calmed down and inquired regarding the agents' presence (Docket No. 28, Tr. 12–14, 24; Docket No. 32, Tr. pp. 67–68, 75, 82–85). After having talked to Agent Zurita, Luna–Mateo verbally consented to the search (Docket No. 29, Tr. 6–7, 16, 22).

Available evidence on record further reveals that Luna–Mateo voluntarily disclosed and admitted to law enforcement agents "having heard things about his son from his neighbors" (Docket No. 32, Tr. p. 72). Agent Zurita testified that both Manuel Luna and Luna–Mateo admitted having been told that when they left the premises "Oliver was bringing suspicious people to their residence and something wrong was going on with Oliver's friends" (Docket No. 28, Tr. p. 22; Docket No. 32, Tr. p. 72). Furthermore, Ms. Conde testified she overheard Luna–Mateo while relating to the agents on how his son (the defendant) had been separated from the Postal Service and the National Guard after testing positive for drug use (Docket No. 28, Tr. pp. 33–34; Docket No. 29, Tr. pp. 25, 27). It is undisputed that at all times Luna–Mateo verbalized his acquiescence to the search team and that he authorized the agents to search inasmuch as he "had nothing to conceal" ("no tengo nada que esconder") (Docket No. 32, Tr. p. 75).

It is also undisputed that both, Manuel Luna and Luna–Mateo, consented to the search (Docket No. 32, Tr. pp. 7–, 74) and

identified for the agents the defendant's bedroom (Docket No. 28, Tr. pp. 17 and 33). It also appears that once the "dummy" box with the drugs was found, Manuel Luna offered to assist Drug Enforcement Administration (DEA) agents by disclosing the places where his brother could be located and taking them to such places (Docket No. 28, Tr. pp. 71–72; Docket No. 32, Tr. pp. 73–74 and 84).

Upon receiving Manuel Luna's written consent and Luna–Mateo's verbal consent, law enforcement agents proceeded to search the house, more specifically, defendant's bedroom. The "dummy" box, subject of the controlled delivery, was found on the left side, upper shelf of defendant's closet (Government's Exhibit 11). The box had not been opened (Docket No. 32, Tr. pp. 27–28, 49, 86).

The evidence presented clearly establishes that at all times Manuel Luna, Luna–Mateo and Ms. Conde were appraised and knew the agents' identity, the facts that prompted their presence at the residence and what it was they were looking for. All three, upon speaking to Agent Zurita, knew that it was Oliver Luna–Rojas the person being sought. Actually, Ms. Conde corroborated Agent Knight's testimony while asserting that another agent, while at the residence, identified the individual in a picture on the wall, as the same individual who hours before under the identity of "Miguel Vega" had received the package (Docket No. 28, Tr. p. 22; Docket No. 32, Tr. p. 84).

At the hearing Agents Rodríguez, Zurita and Knight were able to identify defendant Luna–Rojas as the person under surveillance who had received the package with the heroin on June 5, 1997 (Docket No. 32, Tr. pp. 10, 35–36, 78–79).

## C. Issues

1. **Whether the protective sweep was reasonable.**

2. **Whether Manuel Luna and Luna–Mateo were entitled to authorize the search of the residence and third party's bedroom.**

3. **Whether Manuel Luna and Luna–Mateo knowingly and voluntarily con-**

sented to have their residence searched.

## D. Analysis

### 1. Protective Sweep

■ Although commonly challenged as an investigative technique commonly used by law enforcement offices to circumvent the warrant requirement, protective sweeps are permitted under the Fourth Amendment if there are "articulable facts which, taken together with the rational inferences from those facts" that will reasonably justify the agents' belief that the "area to be swept harbors a person posing a danger." *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). However, a protective sweep does not entail for a full search of the premises but only allows for a brief inspection of part or all of the premises in question for purposes of security or evidence preservation. Thus, its ultimate purpose is that of allowing agents to detect and identify any potential source of danger and avoid destruction of evidence. *United States v. Curzi,* 867 F.2d 36, 39 (1st Cir.1989). Any seizure resulting therefrom must be limited to those items in plain view.

In the instant case, defendant seems to suggest that inasmuch as the agents had surveilled the premises for hours, they knew the residence was occupied by the couple they had seen walking in, thus there was no need for a security sweep. The defense also seems to suggest that the manner in which the protective sweep was carried out and its length, created a hostile environment that negatively impacted the parties' consent to the search.

The evidence on record reflects that several hours prior to the package's delivery, which took place at 7:40 PM, the agents had initiated surveillance of the residence. The delivery took place at 8:00 PM. Approximately, twenty minutes later, while defendant was leaving the residence they attempted to follow him but it was rather impossible due to the existence of backyard alleys that allowed a person to move through the neighborhood without being seen. At 9:30 PM the agents observed two persons—a male and a fe-

male—approaching the house. They did not know who they were but suspected they could be the persons to whom defendant was to deliver the package. Accordingly, they awaited for some time, prior to announcing their presence, to see if the defendant arrived or the package was opened (Docket No. 32, Tr. p. 39).

According to Agent Knight, the decision to conduct a protective sweep and attempt to secure the residents' consent, was prompted by exigent circumstances (Docket No. 32, Tr. pp. 89–90). Due to the neighbors' curiosity, they were compelled to remove the "surveillance van" from the area. Once that was done, the agents could not see the front or back door, thus were unable to see whether the box, still unopened was being removed from the residence (Docket No. 32, Tr. pp. 91–92, 99).

Further, Agent Knight correctly assumed that anticipatory search warrants are not frequently utilized in this jurisdiction. Agent Knight impressed as being fully aware that absent the parties' consent, a search warrant was needed, thus he had made all necessary arrangements that would have allowed him to promptly obtain one (Docket No. 32, Tr. p. 88). Under such scenario, the protective sweep would have only served to secure the premises until the warrant was obtained.

During the sweep, Ms. Conde was briefly detained outside the residence and then allowed to walk in. She was never handcuffed. Manuel Luna, although briefly handcuffed, was released and allowed to sit in the living room while being advised of his rights. The initial sweep lasted only a few minutes, five at the most. No seizures were made.

There is no evidence on record indicating that the security sweep was part of an orchestrated plan to search the house to detect the possible existence of contraband. Government agents already knew that drugs had been delivered and were concealed within the residence. Although Agent Knight at all times intended to request the parties' consent to a search, there is no evidence indicating he had otherwise pre-planned to conduct a security sweep. In any event, as previously stated, no evidence was seized from the same.

Immediately thereafter, as Ms. Conde described, the agents did not have their weapons drawn, no one was talking out loud, and she witnessed while her boyfriend was being advised of his rights. She was also able to listen to and recalled the conversation that ensued with Luna Mateo, defendant's father (Docket No. 28, Tr. 22, 26–27, 33–34).

While this Magistrate–Judge may credit Manuel Luna's and Ms. Conde's statements while describing the nervousness and anxiety caused by the incident (being this their first encounter with such a situation), we may not concur with their argument that such a situation invalidated their consent to the search or that the same was otherwise coerced.

From the testimonies of Luna–Mateo and Manuel Luna and their demeanor in court, the emotional turmoil in which they found themselves is obvious. Luna–Mateo, when realizing what was happening, was the victim of frustration and anger. He so demonstrated by crying and throwing the keys he was carrying to the floor when authorizing the search (Docket No. 28, Tr. 20–21, 32). Manuel–Luna who seems to be a hard working individual, not only wanted to convince law enforcement agents that he was a "serious individual," but admitted he was "mad at his brother for having brought that box into the house" (Docket No. 28, Tr. 71). He subsequently volunteered to assist law enforcement agents in locating his brother. It is highly probable that at hindsight they now consider that absent their consent to have their residence searched, Luna–Rojas would not be in this predicament. However, this is not so.

Even while recognizing that securing a search warrant may be the safest and preferred mechanism for situations like the one at bar, we may not conclude that law enforcement agents violated the scope and purpose of a protective sweep. Further, the sweep was not pre-planned, did not take more than a few minutes, Ms. Conde's and Manuel Luna's detention was not prolonged, and no seizures were made during the same.

### 2. The Search

The Fourth Amendment prohibits unreasonable searches and seizures. Thus, a warrantless search of a suspect's premises is, *per se*, unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined sets of exceptions, such as a valid consent. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Tibolt*, 72 F.3d 965, 968–69 (1st Cir.1995), *cert. denied*, 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996).

To be valid, such consent must be given by a suspect by either word or act, but the words or conduct must be unambiguous, and the consent must be freely and voluntarily given. Although in some circumstances courts may infer consent from defendant's cooperative attitude, it is the government the one bearing the burden of proof to establish consent. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, a search conducted pursuant to consent may not exceed the scope of the consent sought and given. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir.1992). Furthermore, the question of voluntariness is one of fact to be determined from the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Barnett*, 989 F.2d 546, 554–555 (1st Cir.), *cert. denied*, 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993).

Among the factors that courts have considered in evaluating the voluntariness of the consenting party are: the suspect's age, education, experience, intelligence, and knowledge of the right to withhold consent; whether the person was advised of his constitutional rights; whether permission to search was obtained by coercive means or under inherently coercive circumstances; whether the person was in custody and Miranda Rights have been given; whether the person was told a search warrant could be obtained; and the length and nature of the

detention and interrogation. *See: United States v. Barnett*, 989 F.2d at 554–555; United States v. Al–Azzawy, 784 F.2d 890, 895 (9th Cir.1985), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *United States v. Alfonso*, 759 F.2d 728, 741 (9th Cir.1985); *United States v. Salvador*, 740 F.2d 752, 757–58 (9th Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985).

However, it is important to note that no single factor will, by itself, be conclusive as to the voluntariness of the consent. Further, the question of voluntariness is one of fact to be determined from the totality of the circumstances.

With these legal principles in mind, we now turn to the question of whether law enforcement agents received the parties' consent to search the residence and, if so, whether the consent was voluntarily given.

### a. Whether Luna–Mateo and Manuel Luna could have authorized the search.

In this case, it is undisputed that (a) Luna–Mateo was the owner of the residence to be searched; (b) he lived there with his two sons, Manuel Luna and the defendant herein; and (c) it was Luna–Rojas aka Manuel Vega the suspect and target of the investigation.

 It is clear law that a third party can consent to the search of premises over which that party shares common authority. *United States v. Evans*, 27 F.3d 1219, 1229 (7th Cir.1994) (authority to consent when defendant's father owned garage, paid all utilities and usually had complete access to area searched); *United States v. Donlin*, 982 F.2d at 33 (third party's consent remains valid even when the defendant specifically objects to it); *United States v. Cepulonis*, 530 F.2d 238 (1st Cir.), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976).

Common authority has been defined as the mutual use of the property by persons gener-ally having joint access of control for most purposes so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own and that the others have assured the risk that one of their number might permit the common areas to be searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Elliott*, 50 F.3d 180, 185 (2nd Cir.1995); *United States v. Richard*, 994 F.2d 244, 250 (5th Cir.1993).

 The burden of establishing that common authority rests upon the government. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Iribe*, 11 F.3d 1553, 1556 (10th Cir.1993). The government may overcome its burden of establishing the effectiveness of a third party's consent by either presenting persuasive evidence: (a) of both shared use and joint access to or control over the searched area; (b) that the owner of the property to be searched has expressly authorized a third party to give consent to the search; or (c) establishing consent by means of the "apparent authority doctrine," [4] through which the agents may, in good faith, rely on representations made by third parties which purports to have the authority to consent. *Rodriguez*, 497 U.S. at 181, 186–188, 110 S.Ct. 2793 (a police officer's unreasonable basis for believing that authority to consent actually exists must be judged against an objective standard: whether a person of reasonable caution with the facts available to her would believe that the consenting party had authority over the premises); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (the question is whether the officer had a reasonable basis for believing that there had been consent to the search); *United States v. Welch*, 4 F.3d 761, 764 (9th Cir.1993).

Nonetheless, whenever a party has consented to a search, the scope of the search may not exceed the scope of the consent given. *Jimeno*, 500 U.S. at 251, 111 S.Ct.

---

4. In *United States v. Dearing*, 9 F.3d 1428, 1429–30 (9th Cir.1993), it was stated that "the existence of the apparent authority entails a three-part analysis. First, did the searching officer believe some untrue fact that was then used to assess the extent of the consent-giver's use of an access to or control over the area searched? Second, was it under circumstances objectively reasonable to believe that the fact was untrue? ... Finally, assuming that the truth of the reasonably believed but untrue fact, would the consent-giver have had the actual authority?"

1801; *United States v. Zapata*, 18 F.3d 971, 977–78 (1st Cir.1994). In other words, the scope of the consent is determined by asking how a reasonable person would have understood the conversation between the officer and the suspect or third party when the consent was given unless, of course, the party providing consent exercises his/her prerogative to expressly limit the scope of the consent and, consequently, of the search.

The evidence on record clearly demonstrates that all three individuals, the defendant and the two consenting parties, shared all areas within the residence owned by Luna–Mateo. The residence searched "has a living room, a kitchen, dining room. There are three bedrooms. One belongs to my father [Luna Mateo], another belongs to me [Manuel Luna] and the other belongs to him [Luna–Rojas]," the defendant herein. "There are two baths and a half, an extended carport, and the house it has bars on the front of the house." (Docket No. 28, Tr. p. 43). Although Manuel Luna claimed that defendant possessed "control" over his bedroom, the totality of the circumstances depicted in court further establish that all premises of the residence were commonly shared by the three of them and that even though each person had his own bedroom, where they presumably kept their belongings, access to those areas was not restricted among them.

As stated by the Court of Appeals for the Sixth Circuit, "as a general consideration, there is every reason to suppose that mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house. So in that sense, absent special circumstances, all rooms in the residence can be said to be areas of usage common to all members of the family . . ."

More so, upon encountering two persons at the residence, the agents opted to seek the consent to search from the person who identified himself as defendant's brother with whom he shared the residence. More so, upon the arrival of defendant's father, consent to search was sought and obtained from the owner of the residence as well.

Consent was to be inferred not only from the parties' cooperative conduct while accompanying law enforcement agents into defendant's bedroom but from their unequivocal verbal and express consent, which in Manuel Luna's case, was also secured in writing.

### b. Whether the consent to search was voluntarily given.

To determine whether an individual has voluntarily consented to a search or has waived certain constitutional rights, courts must examine the totality of the circumstances surrounding the consent. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041; *United States v. Kimball*, 741 F.2d 471, 474 (1st Cir.1984).

Courts have identified several factors that must be considered in assessing voluntariness, including:

1) the individual's knowledge of his/her right to refuse consent;

2) his/her age, intelligence, education and language ability;

3) the degree to which the individual cooperates with the police;

4) the individual's attitude about the likelihood of the discovery of contraband;

5) length of the detention and the nature of the questioning, including the use of physical punishment or other coercive police behavior;

6) whether law enforcement officers had their guns drawn;

7) whether the [defendant] was told a search warrant could be obtained.

*Schneckloth v. Bustamonte*, *supra* at 248, 93 S.Ct. 2041; *United States v. Morning*, 64 F.3d 531, 533 (9th Cir.1995); *United States v. Twomey*, 884 F.2d 46, 50 (1st Cir.1989).

■ In support of defendant's theory, the only evidence presented was testimonies to the effect that the agents never warned the consenting parties of their right to refuse consent. Nonetheless, knowledge of the right to refuse consent to search is not a requirement to a finding of voluntariness, although it may be a factor in ascertaining whether consent was coerced. *United States v. Garcia*, 56 F.3d at 422 (lack of awareness

that one has a right to refuse consent to enter is germane to determination of whether officers had reasonable basis for believing that there had been consent to search only if such lack of awareness resulted in consent that was the product of duress or coercion). *See also Barnett, supra* (it is not essential that officers first inform party of his/her right to withhold consent to search).

The government, in satisfying its burden, presented or elicited evidence regarding most of the above mentioned factors.

In the instant case, the consenting parties are both adults, gainfully employed. Luna–Mateo is a federal employee with the U.S. Postal Service. His son, Manuel Luna, has completed three years of college education specializing in mechanical engineering. None of them reported any mental or emotional condition that would otherwise affect their capacity to understand their constitutional rights, the purpose of the agents' presence in the premises nor the scope of their request.[5]

Although Agent Knight is an English speaker, all other agents did address Luna–Mateo and Manuel Luna in the Spanish language. Thus, it is clear that both individuals had the age, maturity and intelligence to understand what was happening and to foresee the consequences of the authorization being sought by the agents.

Both individuals, when informed that a package containing drugs was concealed within their residence, were shocked; nonetheless, they assumed a cooperative attitude with law enforcement officers. Luna–Mateo specifically voiced his consent to have the agent search "anywhere they wanted," "the entire house." Manuel Luna, upon being advised of his constitutional rights and after being explained the contents of the written consent to search form, signed the same and consented to the search. He still went a step further and assisted government officials in attempting to locate his brother.

There is no evidence indicating undue psychological or physical coercion. While conducting the protective sweep, it is undeniable that law enforcement agents, in compliance with procedural safeguards, had drawn their weapons and that Manuel Luna was handcuffed. Nonetheless, both episodes subsisted for a very short period of time. More so, the fact that at no point were the weapons aimed at any individual remains unrebutted.

■ The defense argues that Luna–Mateo, being an alcoholic, at the time under the influence of alcoholic beverages, could not have validly consented to the search of his residence. The defense's contention must fail. The case law amply supports the principle that the mere fact that an individual is under the influence of drugs, is otherwise intoxicated or mentally agitated, does not render the consent involuntary. *United States v. George,* 987 F.2d 1428, 1430–31 (9th Cir.1993) (individual consented to the search of his room while at the hospital recovering from drug overdose); *United States v. Rambo,* 789 F.2d 1289, 1297 (8th Cir.1986) (consent to search voluntary despite possibility that given under the influence of narcotics when defendant rationally and coherently responded to questioning and there is no evidence of coercion); *United States v. Gay,* 774 F.2d 368, 377 (10th Cir.1985).

In Luna–Mateo's case, even if we were to assume he was under the influence of alcoholic beverages, absent any evidence of duress, coercion or undue pressure, that fact, *per se,* is insufficient to invalidate the search. Nonetheless, the evidence on record simply demonstrates that in spite of his emotional distress, he recovered, was calmed, coherent and responsive. More so, he arrived at the residence driving his vehicle and did not impress Agent Zurita as being drunk.

Although a consent may not be voluntary if given only in acquiescence to a claim of lawful authority, we cannot conclude that the agents' request was the only or main reason that prompted Luna–Mateo and Manuel Luna to permit the search of their residence. Nor was it prompted by the fact that agents told him they could validly seek and most likely obtain a search warrant.

---

5. The defense's allegations that Luna–Mateo has an alcoholism problem or was under the influence of alcoholic beverages on June 5, 1997, is an issue to be addressed separately.

**66**

The defense correctly argues that Manuel Luna was told that if he did not consent to the search, a search warrant could be obtained. But the global scenario remains to be that:

1) Such fact and statements were conveyed to Manuel Luna in response to his request for a translation of a conversation he overheard between Agent Knight and SS/A Rodríguez (Docket No. 28, Tr. pp. 57–59). In this conversation both agents were discussing the need to secure a search warrant. Under this particular context (and even otherwise) the phrase complained of here was not coercive in any sense. *Twomey,* 884 F.2d at 51.

2) Manuel Luna was either being advised or about to be advised of his rights (as described in the Consent Form) (Government's Exhibit 10) when he decided to consent and signed the authorization form.

3) Even if Manuel Luna would have proceeded to sign the form without it being specifically read to him, it appears that portions of the document were read to him and "parts were explained" to him (Docket No. 28, Tr. pp. 27–28, 36, 55–57), thus, he had reasonable and necessary knowledge of the nature and extent of the authorization sought.

4) The Consent Form which was at least shown to and explained to Manuel Luna is drafted in the Spanish language, factor that made it easier for Manuel Luna to read it and understand its content (Government's Exhibit 10).

■ Thus, in good conscience we may not conclude that the fact that Manuel Luna was told that a search warrant could be obtained (more so in the context it was said), in itself rendered the consent invalid. *United States v. Miller,* 589 F.2d 1117, 1132 n. 13 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (statement that a search warrant will be obtained does not in itself render the consent involuntary); *United States v. Andrade,* 925 F.Supp. 71, 82 n. 6 (D.Mass.1996). If for argument purposes we were to assume it did, still we have that the consent given by Luna–Mateo was valid, inasmuch as it was given prior to the search. The search was one to which Luna–Mateo, an individual with legal and property rights over the premises to be searched, had consented to. Furthermore, there is no doubt that Luna–Mateo also had joint access and control over the premises searched.

**E. Conclusion**

For the above stated reasons it is concluded that the search of defendant's residence was conducted pursuant to the voluntary consent provided by Luna–Mateo (defendant's father) and Manuel Luna (defendant's brother) to law enforcement agents. Government agents in this case properly secured the unequivocal consent of the parties with legal and apparent authority over the premises to be searched. The consenting parties shared use and joint access to and control over the searched area, and the government, in goof faith, was entitled to and did rely on the parties' authority to consent. The search never exceeded the scope of the authorization given nor was the consent ever withdrawn.

Accordingly, it is **RECOMMENDED** that defendant's Motion to Suppress the evidence seized on June 5, 1997, be **DENIED.**

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 504.3 of the Local Rules of Court. Any objections to the same must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Rule 510.1, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to timely file specific objections to the Report and Recommendation is a waiver of the right to review by the District Court. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980). The parties are advised that review of a Magistrate–Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate–Judge. *Paterson–Leitch v. Massachusetts Mun. Wholesale Elec.,* 840 F.2d 985 (1st Cir.1988).

**SO RECOMMENDED.**

July 6, 1998.