**UNITED STATES of America**

v.

**John TIBBS, Defendant.**

**No. 96CR10153–NG.**

United States District Court,
D. Massachusetts.

May 14, 1999.

James M. Doyle, Carney & Bassil, Boston, MA, Alan Campbell, Brookline, MA, for John Tibbs, defendant.

Ralph F. Boyd, Office of U.S. Atty., Boston, MA, for U.S.

## MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS

GERTNER, District Judge.

### I. INTRODUCTION

Defendant, John Tibbs ("Tibbs") moves this Court to suppress evidence seized from the home of Khatisia Goode ("Goode") during a warrantless search conduct by Boston Police Officers on May 2, 1996. The Government contends that the failure to secure a warrant is excused by Goode's consent to the search. Tibbs counters that Goode's consent was not voluntary but rather was obtained through the coercive tactics of the police.[1]

After multiple days of hearings, careful review of the transcripts, and substantial briefing, I agree with the defendant. Tibbs' motion to suppress the materials seized as a result of the May 2, 1996 search is **ALLOWED**.[2]

### II. FINDINGS OF FACT

On May 2, 1996, Sgt. Paul Murphy ("Murphy") of the Boston Police arrested the defendant after receiving information from an informant that the defendant was in a stolen vehicle, with a firearm. As a result of Tibbs' arrest, the police obtained certain keys, which, based on prior police surveillance, they assumed fit an apartment at 67 Washington Street.

Tibbs was Goode's boyfriend. He occasionally stayed over night and left personal effects in Goode's apartment.

The Tibbs–Goode relationship did not last very long. They had been together only a few months before the May 2, 1996 search of her apartment; they broke up almost immediately afterward. While Goode had signed an affidavit on Tibbs' behalf, Goode's affect during the suppression hearing suggested that she was not at all enthusiastic about helping Tibbs. She did not wish to be embroiled any further in the matter, on either side. Her testimony was obtained by subpoena; until the last minute, counsel was not certain that she would arrive at all.

According to Goode, on the night Tibbs was arrested, at approximately 10:00 P.M., Goode was alone with her six year old son in her apartment in the building at 67 Washington Street. She heard a disruption at her front door. When she looked up, the police had opened her door with a key. Eleven or twelve police officers were standing in or near the doorway. She spoke to one of the officers in the front hall of her apartment, asked them what their business was, and immediately informed them that she had a sleeping child in the adjacent room. Mid-way through this conversation with one officer, Goode noticed that there were two other officers crouched in her front closet. When she told them that they had no right to search her closet, they "jumped out." One indicated that if she did not consent to the search, they would get a search warrant, and contact the Department of Social Services (DSS) which would take her child.[3]

---

1. Tibbs' privacy interest in the items seized from the Goode house is not contested.

2. In a closet at 67 Washington St. the police found ammunition. In the living room, the police found a plastic bag with a partially filled box of bullets next to pieces of paper with Tibbs' name on it.

3. She repeated this testimony a number of times and significantly, held her position after vigorous cross examination. Goode testified:

Clearly, a significant factor in Goode's decision to allow the search was that she did not want the officers to take her child away.

Sgt. John Daley ("Daley"),[4] the Boston Police officer at the scene, and Murphy testified that Goode was on the second floor landing as they approached her apartment. She agreed to let them try the key in her lock and invited all eleven or twelve of them into her apartment. But, according to Daley, Goode's oral consent was not enough. He sent someone down to his car to obtain a written consent form for her to execute. He testified that the group of officers remained congregated in the entry way of Goode's apartment, until Daley, seated with Goode in her kitchen, explained the situation and obtained her written consent to search.

I credit Goode's version. In some respects, her testimony is entirely consistent with that of the officers. Where her testimony diverges from that of the officers, I find the officers' testimony less credible.

It is agreed that there were eleven or twelve white officers assembled outside of Goode's apartment, where she was alone with her sleeping six year old child at 10:00 p.m. Murphy had called for reinforcements before searching 67 Washington Street. He had assembled a considerable force even though he knew from police surveillance that Tibbs had left the apartment and was under arrest, and even though he had no information that there were confederates in the apartment. Indeed, belying the notion that the officers were concerned with confederates, they had not surrounded the building prior to entering, nor had they placed anyone at the back door, or first floor landing as a precautionary measure.

It is agreed that the officers had tried Tibbs' key in a number of doors throughout the building. Daley testified that he believed that they had a right to try the key in the door, that that was somehow not a search. The procedure was to try the key in the door when occupant was not home, but to ask permission when he or she was present. According to Daley, they asked for Goode's permission because she was standing on the landing, and she agreed to let them try the key in her door.

In fact, the officers' testimony is inconsistent on this point. Officer Rogers, who was right behind Murphy and Daley, did not notice a woman at all as they came to the second floor.[5] Murphy and Daley claimed that Goode had met them on the second floor landing outside her apartment and invited them in quickly because she feared that the police presence outside her apartment might embarrass her in front of her landlord. That testimony is improbable. A consistent theme in the hearing was Goode's concern with her sleeping child; she mentioned it countless times. No witness suggested that Goode had any idea what Tibbs was involved with, or that she had any knowledge that he had been arrested shortly before. Under the circumstances, it makes no sense that Goode would hear a disruption in the hall, somehow understand that it concerned her boyfriend, and then put herself and her son in

He said it will take me no time to get a search warrant and they were still going to have officers staying there until it came, and that they were going to take my child if I didn't give my consent
Tr. 1/21/99, p. 8:4–7.

When asked if the officers indicated why they would call DSS, Goode testified:
I guess because I told them they couldn't search my apartment like that. When I told them to get out of the closet, this was when they said they was going to get a search warrant, that it would take them no

time at all to get one. As they was going to get a search warrant, they was going to keep a couple officers still in the apartment and they would take my child. That's their words:
Tr. 1/21/99, pp. 34:22–25, 35: 1–4.

4. At the time, Daley was with the Drug Control Unit.

5. He claimed that he saw her in the entryway to her apartment talking to Daley at some point.

harms' way. Nor does it make sense that she would be so concerned at the implications of having many police officers outside her door that she would invite them in to her apartment where her son lay sleeping.

Equally improbable is Daley's testimony that all the officers waited patiently at the threshold of Goode's apartment for some twenty or twenty five minutes, until the written consent was signed. Indeed, Murphy conceded that, consistent with Goode's testimony, there was "probably" a protective sweep into the apartment before any consent was obtained.[6] And the protective sweep might have involved opening the closet door to see if someone was hiding in it.

While the officers vigorously denied making any threats against Goode's child, they agreed that the child was the subject of numerous discussions.[7] It is not a substantial leap to conclude that one officer said to Goode just what she reported, that if she did not consent to the search and they had to get a warrant, she might be a suspect, and her child would be taken from her. In any event, based on her affect, her lack of interest in the outcome, the totality of the presentation, I credit Goode's version.

Finally, testimony with respect to the written form itself raises concern, and strongly suggests that it was window dressing. At some point during the search of Goode's apartment, Daley asked her to sign a form signifying that she had consented to the search. She signed it. Goode testified that she signed it well *after* the search had begun. The consent form reflects it having been signed at 10:45 p.m., some twenty to twenty-five minutes after the police had arrived. Furthermore, although the form indicates that the signer had been told that she had a right to refuse consent, Daley conceded that he did not get into that subject at all. And although the form indicates that the signer may be vulnerable to prosecution if "any incriminating evidence" were discovered in the apartment, Daley testified that this too was not discussed at the time the form was executed.[8]

## III. *LEGAL FRAMEWORK*

The Fourth Amendment reflects a free society's strong preference that searches of private homes by the Government be conducted pursuant to a warrant. *See Payton v. New York*, 445 U.S., 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Welsh v. Wisconsin*, 466 U.S. 740, 748–749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). As the Court explained in *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436, (1948), cited approvingly in *Ca-*

---

**6.** Murphy testified as follows:

Q: Now, at that point, while those conversations [with Goode] were going on, prior to the time any agreement as you described it was signed, did you see any officers searching Ms. Goode's apartment?

A: We wouldn't do that, no.

Q: Now, is there any kind of search that you recall at all being done prior to that time?

A: There was a walk-through to make sure there was nobody armed, or anything. We call it a protective sweep. But we wouldn't search for any evidence or anything.

Q: Do you remember whether a protective search, as you call it, occurred this night?

A: I would. It would have been against all procedure not to do it. I would have to say it probably was done.

Tr. 1/21/99, pp. 71:25, 72: 1–13.

**7.** In addition to talking about the sleeping child and her concerns that he not be awakened, there was discussion of how dangerous it would be for the child if guns or ammunition were in the apartment. Tr. 1/15/99, pp. 27:11–25, 28:1–11.

**8.** On direct examination, Daley indicated that he assured Goode immediately, as the police entered the apartment, that no charges would be brought against her for any gun found in the apartment, no matter what. Tr. 1/15/99, p. 35:8–10. Later he conceded that he may have told her that if only a large amount of contraband were found he would charge her. Tr. 1/15/99, p. 35:12–20. If she *had* been arrested, Daley testified that DSS *would* have been called. Tr. 1/15/99, p. 37:2–6.

*mara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967):

> The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

There are exceptions to the warrant requirement but consistent with the Fourth Amendment's preference, they are narrowly defined. When the government claims that its warrantless search fits within one of these exceptions, it bears the burden of proving it. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir.1992) (holding that the burden is on the government to show the reasonableness of a warrantless search, including demonstrating that the search comes within one of the narrow exceptions to the warrant requirement).

■ Consent is one such exception, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 223, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). And consent under Fourth Amendment law, obligates the prosecutor

to prove that the consent was, in fact, "freely and voluntarily given." *Bumper v. State of North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). *See also Johnson v. United States, supra; Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921).

If the requirement of consent is to be a meaningful one—if the exception is not to swallow the rule—consent cannot be coerced by "explicit or implicit means." *Camara,* 387 U.S. at 528, 87 S.Ct. 1727. In that case, no matter how subtle the coercion was, the resulting "consent" would be "no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." [9] *Schneckloth,* 412 U.S. at 228, 93 S.Ct. 2041.

■ On the one hand, to approve such searches without the most careful scrutiny could legitimize official coercion; on the other hand, to place artificial restrictions upon such searches would jeopardize their validity. To strike an appropriate accommodation, the Supreme Court has determined that "voluntariness" be determined by a totality of the circumstances (rather than the more rigorous requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).[10] *Schneck-*

---

9. In the words of the classic admonition in *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the .duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.'

Cited approvingly in *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041.

10. In *Schneckloth,* the Court agreed that a determinative factor in evaluating voluntariness was the citizen's subjective decision to consent to a search of his property. The major controversy centered on whether the citizen's "consent" must be a knowing and intelligent waiver of the right to be free from unreasonable searches, or whether the consent need only be voluntary in that there was no impermissible police coercion. The *Schneckloth* majority concluded that the waiver standard was limited to those constitutional rights that "protect a fair trial and the reliability of the truth-determining process." *Id.,* 412 U.S. at 236, 93 S.Ct. 2041 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The strict requirement for knowing and intelligent waiver should not be applied to the Fourth Amendment because its protections "have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." *Id.* at 242, 93 S.Ct. 2041.

*loth,* 412 U.S. at 249, 93 S.Ct. 2041. The core issue is whether, taking into account all of the circumstances, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). *See also California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *I.N.S. v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ And the "reasonable person" standard here plainly take account of a "possibly vulnerable subjective state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041. "Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Barnett,* 989 F.2d 546, 555 (1st Cir.1993).

■ Likewise, whether the person whose consent is sought acted voluntary depends upon what the police do and say: "whether the consenting party was advised of his or her constitutional rights [i.e. the right to withhold consent] and whether permission was obtained by coercive means or under inherently coercive circumstances," *id.;* "whether the consent

was subsequent to a claim of authority; whether the government agents gained entry by ruse or deception or whether the government used implicit or explicit threats." *United States v. Maldonado Garcia,* 655 F.Supp. 1363, 1366 (D.P.R. 1987).

### A. *Vulnerability of the Witness*

■ In the instant case, the officers chose not to seek a warrant.[11] They had the time to do so; there were no exigent circumstances. Instead, they chose to descend on the Goode apartment in the evening and in force; Murphy had earlier called for reinforcements, bringing the total number of officers to eleven or twelve, although there was no information that confederates were lurking in the Goode apartment. What they found at around 10:00 P.M. was a woman, alone, with a sleeping six year old child. They entered the Goode apartment and, by their admission, engaged in a "protective sweep." Even if I did not credit her testimony, as I do, I would find the circumstances implicitly coercive—the lateness of the hour, the number of police officers, the vulnerability of the witness.[12] Perhaps, recognizing that the situation was suspect, the police took the time to get a formal written consent, rather than rely on the eleven or twelve police officers' testimony. By the time they secured her signature on the form, however, it was too little, too late.

---

**11.** It is not entirely clear from this record that they could have gotten a warrant. (To be sure, since the government was relying on a consent justification, they were under no obligation to present information on probable cause). While there was probable cause to believe that Tibbs was engaged in illegal activity (the stolen car, and the gun found in it), and evidence linking Tibbs to the Goode apartment (surveillance reports, the fact that a key found on him opened the door to the Goode apartment) there is nothing in this record to suggest that there was information linking any illegal activity to the Goode apartment.

**12.** This record contrasts with that in *Barnett,* in which the court found that "[n]otwith-

standing the inherently unnerving effect of having numerous officers arrive at one's door with guns drawn, Barnett was no 'newcomer' to law enforcement encounters." 989 F.2d at 556. Goode was a "newcomer" to this situation, feeling especially vulnerable because she did not want to traumatize her sleeping child, much less lose him to the DSS.

The record is closer to *Maldonado Garcia, supra,* in which the court found that consent had been coerced because of the defendant's poor physical condition, his repeated expressions of concern for his pregnant wife, his statements to the police that if they let her go, he would tell all—factors which suggested the emotional, psychological and even physical vulnerability of the defendant.

## B. *The Threat*

I find it more likely than not that the police said to Goode perhaps the one thing guaranteed to secure her consent, that her child would be taken away if she did not consent. Here was a woman focused on her sleeping child; she raised the issue with the officers perhaps twenty times, so often that one testified he thought she as trying to distract them. Once they threatened her child, there was no question that she would succumb—hardly voluntarily.[13]

## C. *The Protective Sweep*

■ There was no basis on this record for the officers to engage in a protective sweep. That "sweep" violated the Fourth Amendment, and vitiated her "consent": The police presence in her apartment essentially presented Goode with a *fait accompli.*

In *United States v. Daoust,* 916 F.2d 757 (1st Cir.1990), the First Circuit, citing *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), described the standard for a protective sweep as follows:

> "[P]olice officers, entering a house *with an arrest warrant,* to conduct a protective sweep of a house provided that the officers possess *'a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'* "

916 F.2d at 758 (emphasis added).[14]

In the instant case, there was no arrest warrant; Tibbs had already been arrested. There were no specific facts suggesting

any dangers lurking in the Goode apartment. There was no evidence linking Goode to any of Tibbs' activities.[15]

A number of courts have invalidated "protective sweeps" on facts similar to those presented here. *See United States v. Owens,* 782 F.2d 146, 151 (10th Cir.1986) (once police arrest a person in the hallway outside his hotel room and retreat to a safe area, justification for a protective sweep evaporates); *United States v. Akrawi,* 920 F.2d 418, 421 (6th Cir.1990) (holding that a protective sweep of the second floor of a two-story house was unreasonable when police arrested the person for whom the arrest warrant obtained when he answered the front door, sweep took place at some time around 45 minutes after the arrest, and there was no basis for believing dangerous persons were on the second floor); *United States v. Curzi,* 867 F.2d 36, 39–41 (1st Cir.1989) (holding that an arrest warrant for a person hiding within a third person's home does not permit police to make a protective sweep once the arrest is made outside the home); *United States v. Pena,* 924 F.Supp. 1239 (D.Mass.1996) (police officers' search of a third floor apartment, other than the second floor unit identified in search warrant, could not be justified as protective sweep).

If one credits Goode's testimony that the police went beyond a protective sweep to a full fledged search, the conclusion is unavoidable. The search was unlawful.

## D. *The Consent Form*

Obviously, if the consent form was executed after the search had ended it hardly

---

**13.** *United States v. Gomez,* 1992 WL 315633 (S.D.N.Y.1992) the court agreed that if the defendant's wife was threatened with arrest or the removal of her children to coerce her to sign the consent form, the consent was not voluntarily obtained, and the evidence found as a result of the search would have to be suppressed. The court did not credit the wife's account; I, however, do credit Goode's.

**14.** While it is clear that an arrest warrant is not necessary, without it the exigent circum-

stances calling for a sweep have to be that much more compelling.

**15.** Indeed, Daley was so certain of Goode's lack of involvement that he claimed he assured her that she would not be charged with any ammunition or guns found in the apartment as soon as he entered it. Cf. *United States v. Luna–Rojas,* 28 F.Supp.2d 54 (D.P.R. 1998).

provided a lawful justification for the search. Indeed, even if it occurred before, Daley agreed that nothing about the *content* of the form was discussed and in particular, Goode's right to refuse consent. And while the police claimed that they could get a search warrant if she did not consent, this may have been pure bluff, as there is nothing in the record to indicate that they had probable cause to search Goode's apartment.[16]

## IV. CONCLUSION

I do not take the offense of which the defendant is accused lightly. At the same time, I have an obligation to be "watchful of the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Schneckloth*, 412 U.S. at 229, 93 S.Ct. 2041. As the court noted in *Maldonado Garcia*, "[t]heir conceivably valid objectives do not excuse their invalid means." 655 F.Supp. at 1368. The fruits of the search at 67 Washington Street are suppressed; the defendant's Motion To Suppress, filed on June 9, 1998, is hereby **GRANTED**.

**SO ORDERED.**

---

**16.** In *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), appeal after remand, 5 N.C.App. 528, 169 S.E.2d 65, (1969), judgment aff'd, 275 N.C. 670, 170 S.E.2d 457 (1969), the Court held that the consent given by the defendant's grandmother to the search of the house could not be used to justify the search where the grandmother gave consent only after the official conducting the search asserted that he possessed a warrant, when he did not. When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. If that is false, whether or not the officers could have obtained a warrant, consent procured as a result is vitiated. While the officers here did not say they *had* a warrant, they made it appear that it was inevitable when, as far as I can tell, it was not.